[Civ. No. 57922. Second Dist., Div. Three. June 25, 1980.]

UNITED STATES FIRE INSURANCE COMPANY,
Plaintiff and Respondent, v.
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PENNSYLVANIA,
Defendant and Appellant.

458

COUNSELCOUNSEL

Kern & Wooley, John R. Johnson and Ralph S. LaMontagne, Jr., for Defendant and Appellant.

Clausen, Harris & Campbell, Kenneth H. Clausen and Arthur E. Schwimmer for Plaintiff and Respondent.

OPINIONOPINION

**POTTER, Acting P. J.**—Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania (hereinafter National) appeals from a judgment in favor of plaintiff United States Fire Insurance Company (hereinafter United). The judgment declared the respective parties' obligations as insurers in respect of an aircraft accident in which Philip Morgan, Jr., was the pilot. Claims for the resultant deaths and injuries were settled by United for $1,527,000, with a contribution of $300,000 from a nonparty carrier. The judgment decreed that with respect to the accident: "Defendant's policy AV 347207 covered Philip Morgan, Jr., as an insured and is underlying insurance as to Plaintiff's policy DCL 002799 which likewise covered Philip Morgan, Jr., as an insured. That Defendant's policy must be exhausted before Plaintiff's policy comes into play and/or before any payment is due under Plaintiff's policy, and that Plaintiff, having paid $1,000,000 in settlements that should have been paid by Defendant, is entitled to reimbursement in the amount of $1,000,000 from Defendant plus interest at

the legal rate from the date Plaintiff made its payment; to wit, from September 1, 1976."

The judgment also awarded United judgment against National in the amount of $1 million plus interest.

The evidence before the trial court consisted of an oral stipulation of facts, documentary exhibits 1 through 5, and four depositions which were received in evidence though not marked as exhibits or numbered as such. The oral stipulation provided as follows: [Counsel for plaintiff]: "MR. CLAUSEN / The following facts are stipulated to, for the purposes of this coverage dispute only, and are not binding and have no application in any other proceeding:

"That the accident giving rise to this coverage dispute occurred on October 18, 1974, on which date at Long Beach Airport, Philip Morgan, Jr., piloting a Piper Aztec aircraft, struck a gas storage tank shortly after takeoff. The Piper Aztec then crashed to the ground, all of which caused the death of Morgan and certain deaths and injuries.

"That Philip Morgan, Jr. was negligent; that such negligence approximately [sic] [caused] the accident the resulting deaths and injuries.

"That the occupants of the Piper Aztec at the time of the accident were Philip Morgan, Jr. as pilot, Robert DeRobertis, John C. Whipperman, and Peter Tilson, all of whom sustained fatal injuries, and James Reynolds who sustained serious bodily injury, but who survived the crash.

"That at the time of the accident, Philip Morgan, Jr. was president and chairman of the directors of US West Investments, Golden Pacific Insurance and any and all other subsidiary corporations of US West Investments. That at the time of said accident, Philip Morgan, Jr. was engaged in business activities on behalf of said corporate entities, taking clients and [pro]spective clients on a hunting trip to promote the business of said corporations. That the accident thus arose out of the business of said corporations.

"That at the time of said accident, US West Investments was the record owner of a Beechcraft Bonanza aircraft which was described in the policy issued by defendant, which policy provided specific coverage for

said described Beechcraft Bonanza, and in addition, defendant's policy provided coverage for the operations of nonowned aircraft. Prior to the accident, the specific liability coverage on the Beechcraft Bonanza had been deleted because said aircraft was down for a major overhaul and at the time of the accident, said overhaul had not been completed and the liability coverage on this aircraft had not yet been reinstated. The Piper Aztec aircraft was being used by Philip Morgan, Jr. at the time of said accident instead of the Beechcraft Bonanza, because said overhaul had not been completed.

"That the Piper Aztec aircraft was owned by National Aviation Company and had been either rented or loaned to either Golden Pacific Insurance or US West Investments for use at the time of said accident.

"That the INA (Insurance Company of North America) policy listed in plaintiff's policy as specifically scheduled underlying primary insurance, did not provide any coverage for the use of aircraft.

"The named insureds under plaintiff's policy were US West Investments, Golden Pacific Insurance and all other subsidiary operations of US West Investments and plaintiff's policy limits were $2,000,000 combined single limit per accident or occurrence.

"The named insured under defendant's policy was US West Investments and defendant's policy limits were $1,000,000 combined single limit per accident or occurrence.

"Coverage for any other entity or individual under both or either policy is left for the Court to decide. End of stipulation."

The documentary exhibits included copies of the policies issued by United and National. United's policy was captioned a "Commercial Comprehensive Catastrophe Liability Policy." The pertinent coverage was "to indemnify the insured for ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law...[f]or damages... because of personal injury, including death at any time resulting therefrom, sustained by any person or persons...." The retained limit provision, so far as here pertinent, was as follows:

"[T]he company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of: "(a) the

total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other underlying insurance collectible by the insured; or

"(b) an amount as stated in Item 4(C)[1] of the declarations as the result of any one occurrence not covered by the said policies or insurance; . . ."

The definition of "insured" in the United policy included "any executive officer, director or stockholder of the named insured with respect to the use of an automobile or aircraft not owned by the named insured in the business of the named insured."

As a result of the above provision, it was apparent that Philip Morgan, Jr., individually, was an insured within the personal injury liability coverage of the United policy.

The National policy, on the other hand, clearly did not make Morgan an insured under its bodily injury coverage as of the date of the accident. As originally issued June 14, 1974, National's policy did extend bodily injury coverage to Morgan provided he was "using" the Beechcraft Bonanza aircraft of which U.S. West Investments was the record owner and which was described in the policy declarations, or was "legally responsible for its use." However, with respect to use of nonowned aircraft, such insured status was expressly withheld by an endorsement effective at the initiation of the policy. Coverage with respect to the operation of nonowned aircraft was limited to U.S. West Investments as named insured. The endorsement extending this coverage, for which an additional premium of $175 was charged, deleted the definition of "Insured" which applied to the described aircraft liability coverage as well as special provisions providing automatic insurance for newly acquired aircraft and a special provision governing "Use of Other Aircraft." However, before the accident occurred, further endorsements deleted altogether the described aircraft liability coverage, thus eliminating any coverage under which Morgan was an insured. A substantial premium refund accompanied the subsequent endorsement whereby, in effect, National refunded approximately $200 of a total liability premium of $525 which included $175 for the nonownership endorsement and $350 for the described aircraft liability. Inasmuch as the nonownership endorsement remained in effect for the full policy term, it is apparent that

---

[1]The amount specified in item 4(C) of the declarations was $10,000.

$200 of the $350 described aircraft liability coverage premium was refunded after approximately one-fourth of the policy term had expired. In consideration of this refund, U.S. West Investments became the sole insured for liability purposes and was covered only for use of nonowned aircraft in its behalf.

The stipulated facts, of course, show that both Morgan, personally, and U.S. West, vicariously, were liable for the damages arising from the crash of the nonowned Piper aircraft due to Morgan's negligence. Morgan was also an insured under an owner's policy covering the Piper aircraft. This policy had policy limits of $300,000 which sum was paid in full by the insurer, thus reducing the outlay for settlement to $1,227,000. The issue between United and National thus related to the allocation of responsibility between them for the remaining liability.

United contended that National was responsible to pay $1 million of the loss because National's policy constituted "underlying insurance collectible by the insured," making "the insured's retained limit" under United's policy $1.3 million,[2] so that United's indemnity agreement covered only the excess, or $227,000, leaving National responsible for its full policy limits.

National, on the other hand, contended that whereas United's policy extended coverage both to Morgan, individually, and to U.S. West Investments, National's policy expressly excluded Morgan as an insured in respect of liability arising from the use of nonowned aircraft and covered only U.S. West Investments in that respect. In view of the stipulated fact that the sole cause of the accident was Morgan's negligence for which U.S. West Investments was only vicariously liable, National invoked the rule that a policy which covers the individual liability of a negligent employee as "an additional insured...is primary over a policy...which covers only the vicarious liability of the employer...under the doctrine of *respondeat superior*." (*Hartford Accident & Indemnity Co.* v. *Transport Indemnity Co.* (1966) 242 Cal. App.2d 90, 92 [51 Cal.Rptr. 168].)

In reply, United relied upon the testimony in the four depositions taken of four surviving principals of U.S. West Investments as showing: "Alter Ego Is Applicable. US West Investments and Golden Pacific In-

---

[2]United treated the owner's $300,000 liability policy as underlying insurance in respect of United's policy.

surance Were Alter Egos of Morgan, Anderson, Hammer and Kummer. Phil Morgan, Jr., Is Thus One of Defendant's Named Insureds."[3]

National, in turn, argued that even if the evidence supported a finding of alter ego, the alter ego doctrine was not applicable so as to rewrite its policy by adding an expressly excluded insured, because National was not a party to any inequitable conduct.

National further contended that if both policies were found to cover Morgan's individual liability, the coverage should be prorated in the ratio of the respective policy limits.

The trial court issued a written intended decision. In respect of the evidence concerning the alter ego claim, the court adopted "as its recital of the evidence," pages 1 to 7 of United's trial brief. According to this recital, the principals, who "were separately engaged in the insurance business as agents and brokers" in 1971 "joined forces and merged their businesses into one." "Phil Morgan, Jr., was the dominant, dominating factor. He conceived the idea of combining these various agencies into one business, sold the others on the idea, and thereafter dominated the new business, which the individuals thereafter conducted *substantially as partners* by utilizing several corporate alter egos." (Italics added.)

The status of the twin-engine Bonanza aircraft referred to in National's policy was described by United as follows: "He [Morgan] owned an aircraft before the merger which he brought with him. . . . [A]s among the principals, Morgan alone flew this plane. . . . Morgan used this plane, as he always had, as his own." However, though "Morgan flew the plane on many pleasure-business trips to such places as fishing spots in Mexico, [h]e never made such trips for only his own pleasure. His personal life and his business life were one and the same, and on all such trips clients accompanied him."

One of the corporate alter egos utilized by the partners was U.S. West Investments which was made registered owner of the airplane to avoid a California use tax, and "[s]ince U.S. West Investments was the 'record' owner, the liability insurance policy on this plane, a 1958 twin engine Beechcraft Bonanza, was in the name of U.S. West Investments." The activities of U.S. West Investments were allegedly confined to the above described record ownership and provision of insurance for

[3]United's trial brief, page 8.

said aircraft. It "continued as before to neither receive nor disburse money. It had no bank account or assets, carried on no business and was nothing more than a 'paper entity.'"

The financial aspects of the merged business in the meantime were conducted in the name of another corporate alter ego, Golden Pacific Insurance. "All business continued to be done through Golden Pacific Insurance and the only money the principals received out of the business done came through the form of salary checks from Golden Pacific Insurance and expense reimbursements from Golden Pacific Insurance." "All banking was done in the name of Golden Pacific Insurance....For all practical purposes these men *did business as partners* under the name of Golden Pacific Insurance Agency." (Italics added.) It was in the name of that corporation that the agency license was obtained.

Further facts detailed in United's recital included the issuance of shares in an original U.S. West Investments corporation in proportion to the agreed value of the respective principal's contributed business; and subsequent exchange of these shareholdings by said principals for approximately 90 percent of the stock of an existing publicly held corporation (Protronics, Inc.), a New Jersey manufacturing enterprise which had ceased to do business. The name of Protronics was then changed to U.S. West Investments on dissolution of the original company of that name.

Finally, United claimed: "From the time the '*partners*' combined their businesses to the time of the accident, Phil Morgan, Jr., was president of U.S. West Investments, of Golden Pacific Insurance, and any and all other purported corporate entities utilized by the principals. The remaining '*partners*' were all corporate officers, holding the same title as to each purported corporate entity, and all such purported entities had the same board of directors who were the individuals previously named who had merged their businesses. No Golden Pacific stock was ever issued. Directors' meetings were ordinarily informal business conferences in Phil Morgan's offices, and these meetings usually purported to be directors' meetings of Golden Pacific Insurance.

"Subsequent to Mr. Morgan's death the business became insolvent, ceased operating, and Golden Pacific agency became involved in a bankruptcy. U.S. West Investments was not included in the bankruptcy. It never had assets, nor did it ever receive, hold or disburse any money. It was simply ignored." (Italics added.)

On the basis of the above alleged facts as claimed by United, the trial court opined that "the requisite unity of interest and ownership between Morgan and U.S." to invoke the alter ego doctrine was shown. The court further held that the second element necessary to the application of the alter ego doctrine, "fraud or inequity," was also present. The court referred in this connection to the insolvency of U.S. West Investments and of Golden Pacific and of an inference of inequitable purpose "to be drawn from the intermingling of funds, payment of personal obligations by the corporation, and deposit of the individual's private funds in the corporation's bank account. . . ." The court further relied in this connection upon National's assumed knowledge that Morgan would be flying the airplane so that "he should be deemed a named insured."

Findings of fact and conclusions of law were requested by National. The findings generally conformed to the stipulation and the recital of facts in United's trial brief, with one exception. Instead of finding that U.S. West Investments and Golden Pacific Insurance were alter egos of the several principals who were in effect partners, finding No. 9 stated "[t]hat said purported corporate entities, including U.S. West Investments and Golden Pacific Insurance, were the alter egos of Philip Morgan, Jr." so "[t]hat U.S. West Investments as an alter ego of Philip Morgan, Jr., is but another name for Philip Morgan, Jr., and Philip Morgan, Jr., was thus personally insured under [National's] policy at the time of said accident."

From its findings, the court concluded that "[National's] policy covers Philip Morgan, Jr., individually, as an insured; that [National's] share of said settlement was its full policy limit of $1,000,000 which should have been paid by [National] toward said settlement." The judgment accordingly so declared and awarded United the judgment in the sum of $1 million. This appeal followed.

## Contentions

National contends that: (1) its policy does not cover Morgan individually as an insured and that its coverage of the vicarious liability of U.S. West Investments in respect of Morgan's negligence is secondary coverage following the primary coverage of United's policy which expressly makes Morgan an insured; (2) as an innocent third party, National cannot be subjected to liability on an alter ego theory; and (3) in any event, if National is held to have insured Morgan individually,

the liability for coverage should be prorated on the basis of the respective policy limits.

United contends that: (1) although it "has no quarrel with" the principle invoked in National's first contention, the court properly applied the alter ego doctrine to make Morgan an insured under National's policy; and (2) the United policy is by its terms excess coverage only in respect to any risk having "other underlying insurance collectible," and therefore not subject to proration.

*Discussion*

*Summary*

The nonowned aircraft coverage under National's policy was expressly limited to the vicarious liability of the named insured, U.S West Investments. As such, it was secondary to any coverage of Morgan individually as negligent operator of the aircraft. The claimed alter ego status of U.S. West Investments does not alter the coverage because (1) the rationale for the coverage rule remains fully operative, and (2) there is no fraud or inequity in its application.

Having concluded that United's policy is the primary coverage, it is unnecessary to reach National's contention that liability should be prorated.

*Unless a Contrary Result Is*
*Required Under the Alter*
*Ego Doctrine, National's*
*Coverage Was Secondary*

■ The provisions of both policies were perfectly clear. United's policy specifically extended coverage to Morgan as an insured because he was an "executive officer, director or stockholder of the named insured" and he was using an "aircraft not owned by the named insured in the business of the named insured." On the other hand, under National's policy, the only insured with respect to the use of nonowned aircraft was the named insured, U.S. West Investments. Since the stipulated facts included the fact that at the time of the accident, Morgan "was engaged in business activities on behalf of said corporate entities [U.S. West Investments and Golden Pacific Insurance], taking clients and [pro]spective clients on a hunting trip to promote the business of

said corporations" of which he was president, it is apparent that the primary liability for Morgan's negligence was his own personal liability. Liability imposed upon U.S. West Investments was vicarious liability for Morgan's fault.

The obligations of Morgan and of U.S. West Investments were, therefore, governed by the rule stated in *Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 428-429 [296 P.2d 801, 57 A.L.R.2d 914]: "Where a judgment has been rendered against an employer for damages occasioned by the unauthorized negligent act of his employe, the employer may recoup his loss in an action against the negligent employe [Citations]; that is, as between employer and employe in such a situation, *the obligation of the employe is primary and that of the employer secondary....*

"Under equitable principles of subrogation the insurer of the employer who has been compelled to pay the judgment against the employer may recover against the negligent employe or the employe's insurer. [Citations.]" (Italics added.) Since the policy covering the employee as an insured had policy limits sufficient to cover the loss, such policy was found to be the primary coverage.

*Hartford Accident & Indemnity Co. v. Transport Indemnity Co., supra,* 242 Cal.App.2d 90, relied upon *Continental Cas. Co.* to reach a like result, imposing all liability upon the vehicle owner's policy which made a permissive user an insured and relieving the carrier which covered only his employer on account of vicarious liability.

It is clear, therefore, that under the facts of this case, the United policy, which expressly covered Morgan as an insured, was the primary policy unless that result is avoided by the application of the alter ego doctrine.

*The Alter Ego Relationship Shown by the Evidence Does Not Eliminate the Reason for Making U.S. West Investment's Obligation Secondary*

As pointed out above, the reason National's coverage of U.S. West Investments is secondary to United's coverage of Morgan is that U.S. West Investments was entitled to indemnity against Morgan. Theoretically, if Morgan, as a sole proprietor, and U.S. West Investments were

alter egos, no such obligation to indemnify could arise, because Morgan could not have an obligation to indemnify himself. The evidentiary showing in the trial court, however, did not support any claim that Morgan was a sole proprietor. United in its brief concedes "[t]he fact that there were several men who in essence did business as partners through alter ego corporate shells...." This concession is consistent with the position taken by United in its trial brief where repeated reference was made to the fact that the principals "did business as partners." There is no suggestion in the record that Morgan's flying activities did not promote the entire partnership business and the only possible meaning of the stipulation that at the time of the accident Morgan was flying in behalf of the insured corporations is that he was engaged in partnership activities if in fact such corporations were merely instrumentalities through which the partnership business was carried on.

■ The rule giving an employer a right of indemnity against a negligent employee who subjects him to vicarious liability is equally applicable where the negligent party is a partner and subjects the partnership to vicarious liability.

"The law of partnership is the law of agency. Each partner is the agent of the other, and impliedly agrees that he will exercise reasonable care and diligence in the operation of the partnership business. When a loss is paid by a partnership, there is a right of indemnity against the partner whose negligence caused the loss. Yorks v. Tozer, 59 Minn. 78, 60 N.W. 846, 28 L.R.A. 86, 50 Am. St. Rep. 395. It is the same rule where the principal is held liable for the negligent act of his agent. Upon payment of the loss, the principal may bring action against his agent to be indemnified for the loss sustained: 2 C. J. 721. As stated in Rowley's 'Modern Law of Partnership,' vol. 2, § 983, 'Losses caused wholly by the negligence or misconduct of one party must be borne by him.' In 'The Law of Partnership' by Shumaker (2d Ed.) 160, it is said: 'A partner has no right to charge the firm with losses or expenses caused by his own negligence or want of skill....' Also see 33 C. J. 864." (*United Brokers' Co.* v. *Dose* (1933) 143 Ore. 283 [22 P.2d 204, 205].)

68 Corpus Juris Secundum, section 83, page 522, states the rule as follows: "Where a partnership is liable for injuries to a third person, there is a right of indemnity against the partner whose negligence caused the injuries. [Fn. omitted.]"

It is thus apparent that United's claim that U.S. West Investments was the alter ego of its principals conducting business "substantially as partners" does not alter Morgan's indemnity obligation upon which the coverage question depends.

*No Inequity Justifying*
*Invocation of the Alter*
*Ego Doctrine Has Been Shown*

 In order for the alter ego doctrine to apply, there must be shown not only "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," but further "that, if the acts are treated as those of the corporation alone, an inequitable result will follow." (*Automotriz etc. De California* v. *Resnick* (1957) 47 Cal.2d 792, 796 [306 P.2d 1].) In the trial court, National virtually conceded the existence of the first element. In its brief on appeal, however, National argues: "There was clearly a separate corporate existence." We find it unnecessary to resolve this issue, however, since it is clear, in any event, that even if U.S. West Investments failed to achieve any separate existence, no fraud or other inequitable result will follow if it is recognized as the sole insured under the nonowned aircraft coverage of National's policy. "The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations." (*Aladdin Oil Corp.* v. *Perluss* (1964) 230 Cal.App.2d 603, 614 [41 Cal.Rptr. 239].) Consequently, it may not be applied so as to prejudice the rights of an innocent third party who has dealt with the corporation as such.

An example of this limitation is *Tarter, Webster & Johnson, Inc.* v. *Windsor Developers, Inc.* (1963) 217 Cal.App.2d Supp. 875 [31 Cal.Rptr. 452]. A trial court judgment allowing the plaintiff a materialman's lien against defendant's property was reversed. The defendant contracted with Cal-Mar, a corporation formed by Bailey, Butts and Procopio for the purpose of acting as framing contractors in the construction of buildings, to do the framing in defendant's housing project. Defendant also dealt with Trus-Span, another corporation formed by Bailey and Butts "for the purpose of buying and selling building materials" (*id.*, at p. 877) to furnish the necessary materials to be delivered in "built-up loads" appropriate to construct each house. Plaintiff, a building material supplier, sold Trus-Span built-up loads which were delivered to the property and utilized in the construction of the houses. To escape the consequences of the rule "that one who furnishes materi-

als to a person who is himself a materialman is not entitled to a lien" (*id.*, at p. 878), plaintiff showed facts upon which the trial court found that "Trus-Span and Cal-Mar, were but the *alter egos* of the individuals, Bailey, Butts and Procopio" (*id.*, at p. 879), and on this basis held that plaintiff was entitled to a materialman's lien. In reversing, the reviewing court said (*id.*, at pp. 879-881): "It would serve no useful purpose to review in detail the voluminous testimony which was received upon this feature of the case. It is sufficient for the purposes of this opinion to state that were this an action against these individuals to hold them personally liable for the obligations of these corporations upon the *alter ego* theory, the evidence introduced in this action would be sufficient to justify a judgment against them.

"The difficulty with this situation, however, is that neither Trus-Span nor Cal-Mar nor the individuals who organized them are parties to this action. It appears that the plaintiff, who was in the business of selling lumber at wholesale, sold the materials in question to Trus-Span at wholesale prices, plus an additional charge for making up the built-up loads. The materials thus sold were charged to Trus-Span on an open account. The defendant made its contract with Trus-Span for the purchase of these materials for which defendant agreed to pay a larger price than that charged to Trus-Span. In other words, Trus-Span was making a profit from the purchase and sale of the material. There is no evidence in the record that there was any bad faith on the part of the defendant or that defendant knew of facts which would indicate that the corporations were but the *alter egos* of the individuals. It is the fact that no permit to issue stock was granted to either corporation and apparently no stock was actually issued. The fact remains, however, that both corporations were organized and charters were issued and filed for record.

"The general purpose of the *alter ego* theory is to look through the fiction of the corporation and to hold the individuals doing business in the name of the corporation liable for its debts in those cases where it should be so held in order to avoid fraud or injustice. (*D. N. & E. Walter & Co.* v. *Zuckerman,* 214 Cal. 418 [69 P.2d 839, 79 A.L.R. 329].)

"Generally speaking, in order to enforce the *alter ego* theory bad faith must be shown. (*Hollywood Cleaning & Pressing Co.* v. *Hollywood Laundry Service, Inc.,* 217 Cal. 124 [17 P.2d 709]; *Wilson* v. *Stearns,* 123 Cal.App.2d 472 [267 P.2d 59]; *Luis* v. *Orcutt etc. Co.,* 204 Cal.App.2d 433 [22 Cal.Rptr. 389].)

"<i>.</i> . . . . . . . . . . . . . .

"Referring then to the instant case, it appears from the evidence that the defendant had nothing whatever to do with the two corporations except to contract with them for materials and labor. Bills were rendered by the two corporations and were paid. Waivers of lien were executed and delivered to defendant. On the other hand, the plaintiff, a wholesaler of lumber, agreed to sell lumber to the Trus-Span Corporation as a dealer of materials. There were no representations to the plaintiff that Trus-Span was a contractor. Under such circumstances plaintiff was in the position of selling materials at wholesale to a corporation holding itself out as a retailer and which was in turn selling at a profit to the property owner. Under such circumstances plaintiff would not be entitled to a lien. It is true that Trus-Span failed to pay plaintiff. Had there been either allegation or proof that the defendant in any way conspired to produce such result, defendant might be held liable or a lien might effectually be placed upon its property. Here, however, it is sought to use the *alter ego* theory, not as against the parties who conducted the business in the name of the corporations, but against an innocent third party who has already paid for the materials. It is clear from the prior decisions of the California courts that the *alter ego* theory may not be used for such purpose."

The facts in *Tarter* are indistinguishable from those in the case at bench. Neither U.S. West Investments nor the principals who utilized it are parties to the action. National had nothing whatever to do with organizing or operating U.S. West Investments. Its only relationship to that entity was its contracting to provide insurance coverage relating to the use of aircraft in U.S. West Investment's behalf. Moreover, National had given full consideration in the elimination of Morgan's insured status by substantially reducing the premium.

A similar statement limiting the applicability of the doctrine appears in *Meyer* v. *Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 260-261, where the court said: "Moreover, since the purpose of the doctrine of disregarding the corporate entity is to prevent fraud it cannot be used to inflict an obligation on an innocent corporation or its minority stockholders. (*Oakland Medical Bldg. Corp.* v. *Aureguy, supra,* and *Commercial Lbr. Co.* v. *Ukiah Lbr. Mills, supra; Dashew* v. *Dashew Business Machines, Inc.* (1963) 218 Cal.App.2d 711, 716 [32 Cal.Rptr. 682].)"

Tacit recognition of the same limitation of the doctrine is found in *Roman Catholic Archbishop* v. *Superior Court* (1971) 15 Cal.App.3d 405 [93 Cal.Rptr. 338], where the alter ego doctrine was held inapplicable to subject one subsidiary to liability for the obligations of another subsidiary controlled by the same parent. The court said (*id.*, at p. 412): "'The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable. . .for the equitable owner of a corporation to hide behind its corporate veil.' (*Associated Vendors, Inc.* v. *Oakland Meat Co., supra*, 210 Cal.App.2d 825, at p. 842 [26 Cal.Rptr. 806].)"

The teaching of the foregoing cases is that the fraud or inequity, the elimination of which legitimately invokes the doctrine, must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the "abuse of corporate privilege" (15 Cal.App.3d at p. 411), or must be seeking some inequitable advantage based upon ""'"the fiction of separate existence"'"" (*ibid.*). No such circumstances exist in this case. There is no evidence in the record whatever that National participated in the abuse of U.S. West Investments' corporate privilege. The circumstance that U.S. West Investments and Golden Pacific Insurance both became insolvent is immaterial to the position of either National or United. As insurers who received their agreed premiums for coverage, they have no concern with the ability of their insureds to satisfy claims. In recognition of this fact, Insurance Code section 11580, subdivision (b), provides that the insurer's obligation is not affected by the insolvency or bankruptcy of the insured during the life of the policy.

The trial court's finding of inequity was premised on the assumption that if Morgan were not made an insured under National's policy, it "would be permitted to avoid its obligations and the risks which it voluntarily undertook under the subject insurance policy for which it had been duly compensated, thereby unfairly placing [United] in the position of a primary, rather than an excess, insurer." There are two faults with this premise. The first is the assumption that National voluntarily undertook to insure Morgan against personal liability, and the second is that it was compensated for any such coverage. As above pointed out, approximately $200 of an original annual premium of $350 for aircraft liability coverage which did cover Morgan was refunded when the described aircraft liability coverage was deleted after it had been in effect two and one-half months. Substantially, the only liability coverage

premium retained was the $175 annual premium for the nonownership coverage which was limited to the named insured, U.S. West Investments. After this endorsement, National neither undertook coverage of Morgan nor received compensation therefor.

Though the effect of this withdrawal of coverage unquestionably increased United's exposure under its policy which expressly covered Morgan's individual liability, it is difficult to see how National is chargeable with any inequity in this respect. ■ "An insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." (*Continental Cas. Co.* v. *Phoenix Constr. Co., supra*, 46 Cal.2d at p. 432.) If Morgan was willing to rely upon the coverage provided by the owner's policies for the borrowed aircraft and thereby save U.S. West Investments premium dollars, the pro rata refund of the liability premium was reasonable if not obligatory. (Ins. Code, § 481, subd. (a)(2); *Jenson* v. *Allstate Ins. Co.* (1973) 32 Cal.App.3d 789, 793.)

■ In any event, there is nothing in the record in any respect suggesting that the deletion of individual coverage for Morgan violated any rights or expectations of United. United's policy expressly covered Morgan as an insured while he was operating a nonowned aircraft in the business of U.S. West Investments. There was, however, no evidence that United relied upon the existence of any underlying insurance, other than that usually carried by the nonowned aircrafts' owners, to reduce its exposure under this coverage. The fact that the National policy was not scheduled, though provision was made for scheduling of policies upon which the premium was based, belies any inference that United acted on the assumption that there was underlying insurance carried by U.S. West Investments.

The record is equally devoid of any evidence that National had any reason to believe that there was an umbrella policy providing such unusual coverage as that specified in the United policy or that the National policy would not be scheduled in any such umbrella policy, should it exist. We are, consequently, unable to find any basis for accusing National of inequity of any kind; it simply provided the coverage which its insured was willing to pay for, and the alter ego doctrine cannot appropriately be applied to impose liability upon it. The United policy, therefore, was the primary coverage for liability caused by the negligence of Morgan while flying in the course of the business of U.S.

West Investments. Its policy limits were adequate to cover all the loss suffered by the injured parties. No occasion, therefore, arose for resort to National's coverage of the vicarious liability of U.S. West Investments.

The judgment is reversed and the cause remanded with directions to enter a judgment in favor of defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania.

Cobey, J., and Allport, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 20, 1980.