[No. D009456. Fourth Dist., Div. One. Aug. 20, 1990.]

STANLEY N. SHAPOFF, Plaintiff and Respondent, v.
JOHN SCULL et al., Defendants and Appellants.

1458

COUNSEL

Lorez, Alhadeff, Lundin & Oggel, David E. Lundin and Michael R. Thorp for Appellants and Defendants.

Margaret Kathryn Maas and R. Richard Farnell for Plaintiff and Respondent.

OPINION

**BENKE, Acting P. J.—**

SUMMARY

Defendants and appellants John Scull, Christopher Boomis and SERJ Corporation (SERJ) appeal from a judgment entered against them. The judgment, consisting of $55,000 for breach of contract, $50,000 in compensatory damages for intentional interference with contractual relations and $300,000 in exemplary damages, was in favor of plaintiff and respondent Stanley N. Shapoff. The judgment was based on jury findings SERJ had breached a development agreement with Shapoff and that the breach was caused by Boomis's tortious interference.

Prior to submission of the legal claims to the jury, the trial court had determined Scull and Boomis were in fact alter egos of SERJ. The trial court found that the corporation had no capital and that the nature of its development project was controlled by Boomis.[1]

---

[1] The trial court stated: "[I]t is patent that SERJ is a shell. It has no assets, never has had any assets. It owns no furniture, no equipment, no space, has no employees. It consists of Mrs. Boomis and Mr. Scull; has only one project; was organized for development. It's also

After the jury returned its verdict the trial court entered judgment for Shapoff and against Scull, Boomis and SERJ. As against Boomis the judgment awarded Shapoff $55,000 in contract damages, $50,000 in tort damages and $300,000 in punitive damages.

The defendants made a timely motion for a new trial and for a judgment notwithstanding the verdict. They argued the judgment was inconsistent in that it made Boomis liable both for breach of, and interference with, the same contract. They asked the court to enter judgment in Boomis's favor on the interference claim because they believed the court's alter ego finding, as a matter of law, precluded Boomis's tort liability.

At the hearing on the posttrial motions, the trial court agreed Boomis could not be held liable both for breach of and interference with a contract. However the court declined to find that its alter ego determination relieved Boomis of tort liability as a matter of law. Rather the court allowed Shapoff to elect between his claims against Boomis. As one might expect Shapoff chose to proceed on the tort claim. Accordingly the trial court amended its judgment to delete its determination Boomis was an alter ego of SERJ.

The defendants filed a timely notice of appeal from the amended judgment.

### ISSUES ON APPEAL

On appeal the defendants argue the trial court had no power to delete its alter ego determination from the original judgment, that the alter ego finding bars Shapoff's tort claim as a matter of law and that even in the absence of the alter ego finding Boomis cannot be held liable for interference with contractual relations.

Like the trial court, we do not believe the alter ego finding is, as a matter of law, a defense to the tort claim. Moreover, we find nothing in the record before us which establishes such a defense. Accordingly, we affirm the judgment.

---

patent to the court that it was organized as an instrument to obtain development projects for construction activities in which Mr. Boomis was interested.

"The court was particularly struck with Mr. Boomis's statement that he directed what kinds of projects, he chose what kinds of building; it was his decision as to the kind of design because the SERJ corporation could not receive financing unless he selected the type of building and it's consistent with the rest of the inferences from the testimony that Mr. Boomis made, the principal developmental decisions with regard to the nature of the project that the SERJ corporation would engage in.

"He was not a consultant, an independent bidder, as it were, but the controller of the developmental destiny of the SERJ corporation."

## DISCUSSION

## I

### *Evidence of the Parties*

### 1. *Shapoff's Claims*

At trial Shapoff testified that in the early part of November 1985 he was introduced to Boomis and Scull by a real estate broker. The broker told Shapoff that Boomis and Scull needed assistance in finding financing for a real estate development project in downtown San Diego. During a series of three meetings Shapoff learned SERJ opened an escrow which would permit it to acquire a parcel of property on K Street between 6th and 7th and that SERJ planned to construct a high-rise office building on the property. Construction of the building would be handled by Boomis who had an interest in various construction companies.

At the time Shapoff met Boomis and Scull, the escrow on the property was due to expire in a few weeks. Because SERJ had been capitalized with only $500, unless equity financing was obtained promptly Boomis and Scull would incur additional expense in order to extend the escrow.

According to Shapoff, Boomis and Scull offered him a 25 percent interest in SERJ if he would agree to assist them in finding financing. Shapoff accepted this offer and terminated his relationship with Schoemacher Development Company where he had been a principal and president.

In the middle of November 1985 Shapoff began working at offices leased by a company owned by Boomis. In preparing materials for distribution to potential investors, Shapoff learned that under the terms of the pending escrow SERJ would pay $925,000 for the K Street property. By the middle of December Shapoff had attracted the interest of two investors, Milton Sirokin and Michael Saywitz (S & S). On January 6, 1986, S & S sent SERJ a written proposal which suggested a joint venture between SERJ and S & S. Instead of an office building, S & S suggested constructing a hotel on the K Street property. Significantly, S & S's proposal required that SERJ contribute the property to the joint venture at SERJ's cost.

S & S's proposal was acceptable to SERJ. However, on January 29, 1986, at a meeting between Shapoff, Scull and Boomis, Boomis told Shapoff he did not want SERJ to contribute the property at its cost. Rather, Boomis wanted Shapoff to represent to S & S that the acquisition cost was higher than the $925,000 purchase price. Boomis told Shapoff he wanted to recoup

approximately $85,000 in losses he had incurred on other projects. Shapoff refused to make any misrepresentations to S & S and left the meeting.

Another meeting between Shapoff, Scull and Boomis on the following day ended after Shapoff told Boomis he had already disclosed the terms of the escrow to S & S. Boomis told Shapoff to get out of the office and to take his belongings with him.

Shapoff told S & S what had transpired between Boomis and him. S & S then abandoned its efforts to provide financing for SERJ's project.

Ultimately, SERJ formed a partnership with the seller of the property, one of Boomis's construction companies, and others and successfully completed construction of a Ramada Hotel on the K Street property.

### 2. Boomis's Defense

In defense of the claims made against him, Boomis testified he had no control over SERJ and all the corporation's business decisions were made by Scull and Zaida Boomis. With respect to Shapoff's departure on January 30, 1986, Boomis testified he never asked Shapoff to misrepresent SERJ's acquisition costs. Rather, according to Boomis, he told Shapoff to leave his corporation's office space because Shapoff had agreed to allow another developer to participate in a commercial project in Santee. Boomis felt he should have been given the opportunity to participate in the Santee project. According to Boomis, Shapoff's continued participation in SERJ was entirely Scull's business.

## II

### Intentional Interference With Contract by Alter Egos

The defendants assert there is no California authority which discusses the effect that an alter ego finding has on a defendant's liability for intentional interference with contractual relations. This view of the law, while accurate in a very narrow sense, is incomplete.

The tort of interference with contract is a species of the broader tort of interference with prospective economic advantage. (*Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 994 [135 Cal.Rptr. 720].) In order to establish a claim for interference with contract, a plaintiff must plead and prove: (1) a valid and existing contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship;

(4) actual breach or disruption of the contractual relationship; and (5) resulting damage. (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587]; *Dryden* v. *Tri-Valley Growers, supra*, 65 Cal.App.3d at p. 994; *Contemporary Investments, Inc.* v. *Safeco Title Ins. Co.* (1983) 145 Cal.App.3d 999, 1002 [193 Cal.Rptr. 822]; *Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 78 [154 Cal.Rptr. 43].)

■ Contrary to the defendants' argument, a party to a contract may under some circumstances be held liable in tort for inducing its breach. (See *Rosenfeld, Meyer & Susman* v. *Cohen* (1983) 146 Cal.App.3d 200, 224 [194 Cal.Rptr. 180] (*Cohen*); *Olivet* v. *Frischling* (1980) 104 Cal.App.3d 831, 838 [164 Cal.Rptr. 87] (*Olivet*); *Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64 [35 Cal.Rptr. 652] (*Wise*), see also *California Auto Court Assn.* v. *Cohn* (1950) 98 Cal.App.2d 145, 150 [219 P.2d 511] (*California Auto Court*); *James* v. *Herbert* (1957) 149 Cal.App.2d 741, 746-747 [309 P.2d 91] (*James*).) In particular *Cohen*, *Olivet* and *Wise* hold that where a party to a contract has conspired with a third party to breach the contract, the contracting party may be held liable in tort as a coconspirator. In reaching its holding, the court in *Wise* stated: "We think that the better reasoned cases hold that an action for conspiracy to induce a breach of contract will lie against a party to the contract who is included among the defendant-conspirators. Such cases, in our view, rest solidly on the principle that all who are involved in the common scheme are jointly and severally responsible for the ensuing wrong . . . .

". . . . To hold the contracting party along with his confederates liable in tort seems to us not only to be within the compass of the above principle but also consonant with good morals. We perceive no fatal anomaly in the circumstance that the plaintiff may, as he does here, seek relief in an independent cause of action on the contract. It happens frequently that the wrongful act at the center of the controversy may partake of the nature of both tort and contract and in such event the wronged plaintiff may sue in tort for the wrongful invasion of his rights and also sue for breach of contract. [Citation.] A complaint may in different counts set forth inconsistent causes of action." (223 Cal.App.2d at pp. 71-72.)

Of course, in finding contracting parties liable on a conspiracy theory, *Cohen*, *Olivet* and *Wise* presuppose the existence of bona fide third parties, the absence of which is at the heart of Boomis's argument on this appeal. Implicitly, the defendants suggest the trial court's alter ego finding in this case prevents existence of a third party and hence the occurrence of any interference by a third party. As we explain in greater detail below, we

reject the equation the defendants draw between an alter ego finding and the absence of tort liability as a third party.

■ Our review of California law discloses ownership and control of an entity do not by themselves relieve a defendant from tort liability for interfering with the entity's contracts. (*Collins* v. *Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 883 [306 P.2d 783] (*Collins*); *Culcal Stylco, Inc.* v. *Vornado, Inc.* (1972) 26 Cal.App.3d 879, 882-883 [103 Cal.Rptr. 419] (*Culcal*); *Kozlowsky* v. *Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 598-600 [86 Cal.Rptr. 52] (*Kozlowsky*); *Olivet, supra,* 104 Cal.App.3d at pp. 840-841; Rest.2d Torts, §§ 769, 770.) Rather, the tort liability of an owner, director or manager depends upon whether he was acting to protect the interests of the entity. Only if he was acting to protect the entity's interests may he escape liability. In contrast, alter ego liability is not predicated on a defendant's intent to advance the interests of a corporation; rather, it may be used only when its use will avoid fraud or injustice. (See 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, §§ 12-18, pp. 524-532.) Thus, we find that where a defendant's conduct is not otherwise privileged, the potential existence of liability will not protect the defendant from tort liability.

A. *Tort Liability of Owners, Managers and Advisers for Breach*

A number of California cases have discussed the tort liability of individuals, like Boomis, who own, manage or advise a party which has terminated an economic relationship. Those cases have consistently found owners, managers and advisers may be held liable in tort as third parties where they were not acting to protect the interest of the contracting party.

In *Collins, supra,* 47 Cal.2d 875, the plaintiffs, who were real estate brokers, had a listing agreement with a corporation which provided the brokers with a commission upon presentation of a buyer ready willing and able to purchase the corporation's property. The brokers were successful, and the corporation signed escrow instructions which provided for sale of the property to a buyer produced by the brokers. The corporation then withdrew the escrow instructions and arranged to sell the property to another buyer. In addition to alleging a contract claim against the corporation, the brokers sued officers and shareholders of the corporation for interference with the corporation's agreement with the brokers. In describing the brokers' tort cause of action, the court stated: "These 'causes of action' repeat the substance of the allegations of the counts against the corporation and add the following averments: Engle, Vickter, and one Lipson were the officers and directors of defendant corporation and 'beneficial owners' of its property; no stock of the corporation was ever issued. While the above mentioned escrow was still open, Engle and Vickter, with full knowledge of

plaintiffs' contract with the corporation, 'wrongfully, intentionally, and without justification,' prevented the corporation from depositing in the escrow 'those documents necessary in order to close said escrow.' The individual defendants did this to prevent closing of the escrow and to permit the corporation and themselves to profit by a sale to others. Engle, president and managing officer of the corporation, had power, on behalf of the corporation, either to complete sale or to prevent its completion, and he, joined by Vickter, caused the corporation to send written notice of withdrawal from escrow on or about November 19, 1954." (*Id.* at pp. 879-880.) In finding these allegations sufficient to state a claim against the individual defendants for intentional interference with contract, the Supreme Court stated: "Plaintiffs have alleged the existence of a valid contract and an intentional unjustified interference with it by the individual defendants which caused defendant corporation to breach such contract to plaintiffs' damage. Whether or not Engle and Vickter were privileged to cause the corporation to discontinue its relations with plaintiffs, *in the belief that such a course of action was in the best interests of the corporation*, is a matter of defense, to be decided by a resolution of the factual issues presumptively involved. Their right, if any, to such privilege, does not affirmatively appear on the face of the complaint." (*Id.* at p. 883, italics added.)

In *Kozlowsky, supra,* 6 Cal.App.3d 593, the plaintiff had been the president of a bank. In his complaint he alleged the bank's liability in contract for wrongful termination and additionally, alleged the principal shareholder of the bank, defendant Caspers, was liable for intentional interference with his employment contract. Plaintiff had alleged Caspers "at all times owned and controlled a majority of the capital stock of the Bank and thereby controlled the Bank's actions." (*Id.* at p. 598.) In finding plaintiff could nonetheless state a claim against the shareholder for tortious interference, the Court of Appeal stated: "The law recognizes that interference by a person having a financial interest in a matter must be evaluated differently from interference by a stranger. Section 769 of the Restatement of Torts states: 'One who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor [¶](a) does not employ improper means, and [¶](b) acts to protect his interest from being prejudiced by the relation.'" (*Id.* at p. 599.)

"We recognize that a majority stockholder has an important interest in the bank, justifying the expression of his views to the directors in matters affecting the bank's well being and his own as a stockholder. But the board of directors has responsibilities to persons other than the holder of the majority voting power. We cannot say, as a matter of law, that, by virtue of

Caspers' position as majority stockholder and director, his interference with the business relationships of the Bank would be, under all conceivable circumstances, privileged.

"In the case at bench the complaint does not allege any of the circumstances surrounding Caspers' action except to say that he acted 'wantonly, maliciously and without justification.' Such an allegation imports that defendant was not acting for the protection of *his legitimate interests as a shareholder*. [Citation.] Under the authorities reviewed above, we must conclude that the complaint states a cause of action, and that the question of defendant's privilege, as a stockholder, to seek plaintiff's discharge is a matter of defense." (6 Cal.App.3d at p. 600, italics added.)

In *Culcal, supra*, 26 Cal.App.3d 879, the plaintiffs had licenses to operate shoe retail outlets in Unimart stores. The licenses were granted by Food Giant. The plaintiffs alleged their license agreements were terminated without just cause. Among other claims, they brought tort claims against Food Giant's corporate parent, Vornado, Inc., for interference with the license agreements. Relying on *Collins, Kozlowsky*, and section 769 of the Restatement Second of Torts, the Court of Appeal found a tort claim against the corporate parent of a contracting party could be stated: "[D]efendants, being the principal owners of a business, without more, did not make their intentional interference with a contract of the business privileged as a matter of law—that is, privileged 'under all conceivable circumstances.' The privilege that arises by reason of section 769 is at most a qualified one dependent for its existence upon the circumstances of the case. It is essentially a state-of-mind privilege and therefore its existence cannot normally be satisfactorily determined on the basis of pleadings alone. [Citation.] The resolution of the issue turns on the defendants' predominant purpose in inducing the breach of the contract. [Citation.] This is preferably a matter to be determined on the basis of proof rather than of pleading." (26 Cal.App.3d at p. 883.)

■ In addition to the qualified privilege of owners, California has also consistently recognized a privilege for one who manages the affairs of another or advises another with respect to the performance of contracts. However, the so-called "manager's" or "advisor's" privilege, like the owner's privilege, requires a defendant demonstrate he was acting on behalf of the contracting party. "The privilege to induce an otherwise apparently tortious breach of contract is extended by law to further certain social interests deemed of sufficient importance to merit protection from liability. Thus, a manager or agent may, with impersonal or disinterested motive, properly endeavor to protect the interests of his principal by counseling the

breach of a contract with a third party which *he reasonably believes to be harmful to his employer's best interests.*" (*Olivet, supra,* 104 Cal.App.3d at pp. 840-841, italics added, fn. omitted.) To claim the privilege, a manager or adviser need not be acting solely on behalf of his employer or client; rather, he is entitled to the protection of the privilege so long as he can establish his employer's or client's interest was one of the factors motivating his conduct or advice. (*Los Angeles Airways, Inc.* v. *Davis* (9th Cir. 1982) 687 F.2d 321, 327.)

In *Olivet, supra,* 104 Cal.App.3d 831, the individual defendants were members of the board of directors of a hospital. The plaintiffs alleged the individual defendants had formed a partnership which competed with the plaintiffs' equipment leasing company for the hospital's business. According to the plaintiffs, the defendants had used their position on the hospital's board to cause the hospital to stop doing business with the plaintiffs' company. In addition to finding potential tort liability on a conspiracy theory, the court rejected the defendants' claim that their acts as hospital directors were privileged. "[W]hen a manager induces a breach in the hopes that he himself might fill the resultant economic void, he acts not as a servant, i.e., as one upholding his master's best interests, but rather as a naked competitor, devoid of the protections accorded those who labor under standards of fidelity, good faith and fiduciary responsibility." (*Id.* at p. 841.)

B. *Alter Ego*

■ Unlike tort liability for economic interference, liability as an alter ego does not depend upon whether an owner or manager was acting in the interest of a contracting party. " 'It is the law in California as elsewhere that, although a corporation is usually regarded as an entity separate and distinct from its stockholders, both law and equity will, when necessary to circumvent fraud, protect the rights of third persons and accomplish justice, disregard this distinct existence and treat them as identical.' *The issue is not so much whether, for all purposes, the corporation is the 'alter ego' of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form.*" (*Kohn* v. *Kohn* (1950) 95 Cal.App.2d 708, 718 [214 P.2d 71], italics added.)

In general the two requirements for application of the alter ego doctrine are "(1) that there be such unity of interest and ownership that the separate

personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." (*Automotriz etc. De California* v. *Resnick* (1957) 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042].) The requirements of the doctrine may be met where, as here, the corporation is undercapitalized in light of its prospective liabilities. (*Id.* at p. 797; *Engineering etc. Corp.* v. *Longridge Inv. Co.* (1957) 153 Cal.App.2d 404, 415 [314 P.2d 563].)

██ ██ However, one who has attempted to benefit from the corporate form of doing business may be estopped to deny a corporation's existence. (*Aladdin Oil Corp.* v. *Perluss* (1964) 230 Cal.App.2d 603, 614 [41 Cal.Rptr. 239]; *Petersen* v. *Cloverdale Egg Farms* (1958) 161 Cal.App.2d 792, 798-799 [327 P.2d 127]; *Wynn* v. *Treasure Co.* (1956) 146 Cal.App.2d 69, 76 [303 P.2d 1067].) "Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges. The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations." (*Aladdin Oil Corp.* v. *Perluss, supra*, 230 Cal.App.2d at p. 614.)

We also note that even where no estoppel would arise and the facts disclosed in a particular record would be sufficient to establish the unity of interest and control necessary to ignore a corporation's separate identity, disregard of the corporate entity is in no sense automatic. (See *United States Fire Ins. Co.* v. *National Union Fire Ins. Co.* (1980) 107 Cal.App.3d 456, 469 [165 Cal.Rptr. 726]; *Tarter, Webster & Johnson, Inc.* v. *Windsor Developers, Inc.* (1963) 217 Cal.App.2d Supp. 875, 877 [31 Cal.Rptr. 452].) For instance, in *United States Fire Ins. Co.* v. *National Union Fire Ins. Co.*, the plaintiff insurance company provided liability coverage for a corporation and its president. Due to the president's negligence, a plane he was piloting crashed, resulting in his death and the death and injury of others. The plaintiff insurer paid over $1 million in settlement of the claims and brought an action to recover on a second policy which provided coverage to the corporation only. At trial plaintiff proceeded on the theory the president was the alter ego of the corporation and therefore his acts were the corporation's for purposes of determining coverage under the second policy. The trial court accepted this rationale and found coverage under the second policy. The Court of Appeal rejected such use of the alter ego doctrine. "[T]he fraud or inequity, the elimination of which legitimately invokes the doctrine, must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the 'abuse of corporate privilege' [citation], or must be seeking some

inequitable advantage based upon ' " " "the fiction of separate existence" ' "' (*ibid.*). No such circumstances exist in this case. There is no evidence in the record whatever that [the second insurer] participated in the abuse of [the corporation's] corporate privilege." (107 Cal.App.3d at p. 472.)

The court in *Tarter, Webster & Johnson, Inc.* v. *Windsor Developers, Inc., supra,* 217 Cal.App.2d Supp. 875, reached a similar result. There the plaintiff sought to establish a materialman's lien against defendant's property. Because a lien could be established only if the plaintiff had supplied the materials to the contractor responsible for construction on the defendant's property, the plaintiff tried to establish that the contractor was an alter ego of the entity which had purchased the materials. Again such an application of the alter ego doctrine was rejected. "Here . . . it is sought to use the *alter ego* theory, not as against the parties who conducted the business in the name of the corporations, but against an innocent third party who has already paid for the materials. It is clear from the prior decisions of the California courts that the *alter ego* theory may not be used for such purpose." (*Id.* at p. Supp. 881.)

Thus it is plain that contrary to the defendants' argument on appeal, abuse of the corporate privilege by itself does not require that a court disregard the separate identity of a corporation. There must be some equitable purpose which will be served by ignoring the corporate form.

### C. *Boomis's Tort Liability*

■ With respect to Boomis's tort liability it is difficult to imagine what equitable goal would be served by using the alter ego doctrine to defeat Shapoff's tort claim. Indeed, rather than promoting the ends of justice, such use of the alter ego doctrine would allow Boomis to avoid tort liability for which he is otherwise responsible.

■ As disclosed in our previous discussion of the "owner's" and "managers" privileges, one who owns or controls a contracting entity may escape liability for interfering in the entity's contracts only after demonstrating he was acting to further the interests of the contracting entity. (Rest.2d Torts §§ 769, 770.) As privileges, these are matters for which a defendant bears the burden of pleading and proof. (*Culcal Stylco, Inc.* v. *Vorando, Inc., supra,* 26 Cal.App.3d at p. 883.) Here, Boomis did not tender the privilege issue to the jury either by way of argument or requested instructions. Moreover, what evidence there is as to his motive suggests Boomis was acting to recoup his losses on non-SERJ investments or, if one

believes Boomis's testimony, in retaliation for loss of the entirely unrelated Santee project. In either case, the evidence does not suggest Boomis was acting to protect SERJ's interests.[2]

 Thus, in arguing the alter ego doctrine protects Boomis from liability, the defendants are attempting to provide Boomis with the very relief the courts in *Collins, Koslowsky, Culcal* and *Olivet* denied similarly situated defendants: immunity without regard to motive. We reject such use of the alter ego doctrine—it is designed not to provide an escape from liability but to prevent abuse.

We decline to follow the out-of-state authorities the defendants rely upon in arguing alter egos may not be held liable for interference with contract. (See, e.g., *Rao* v. *Rao* (7th Cir. 1983) 718 F.2d 219, 225; *Friedman & Son, Inc.* v. *Safeway Stores* (Colo. Ct. App. 1985) 712 P.2d 1128, 1131; *Rural Development, Inc.* v. *Stone* (Tex. Ct. App. 1985) 700 S.W.2d 661, 667, disapproved on other grounds by *Sterner* v. *Marathon Oil Co.* (Tex. 1989) 767 S.W.2d 686, 690; *Giblin* v. *Murphy* (1983) 97 A.D.2d 668 [469 N.Y.S.2d 211, 214-215]; *Straynar* v. *Jack W. Harris Co.* (1979) 150 Ga.App. 509 [258 S.E.2d 248, 249-250].) Those cases are not persuasive. They do not discuss either the substantive burdens a defendant must meet in order to escape tort liability, or the well developed limitations on use of the alter ego doctrine. Rather, each of these out-of-state authorities assumes a defendant's status as an alter ego is an entirely objective fact to be considered apart from the effect application of the doctrine will have on the parties. In California, the doctrine has been applied with a great deal more circumspection. (See *Aladdin Oil Corp.* v. *Perluss, supra,* 230 Cal.App.2d at p. 614; *United States Fire Ins. Co.* v. *National Union Fire Ins. Co., supra,* 107 Cal.App.3d at p. 469.) Moreover, we note a number of our sister states, like California, allow owners and managers to escape liability only if they can demonstrate they were acting to protect the interests of their principals or employers. (See *Olympic Fish Products, Inc.* v. *Lloyd* (1980) 93 Wn.2d 596 [611 P.2d 737, 739]; *Phillips* v. *Montana Ed. Ass'n* (1980) 187 Mont. 419 [610 P.2d 154, 158]; *Borecki* v. *Eastern Intern. Management Corp.* (D.N.J. 1988) 694 F.Supp. 47, 56, applying New Jersey law; see also Annot. (1989) 72 A.L.R.4th 527-529.)

---

[2] In attempting to establish the manager's privilege, the defendants rely upon *Becket* v. *Welton Becket & Associates* (1974) 39 Cal.App.3d 815, 823 [114 Cal.Rptr. 531]; *Pratt* v. *Local 683, Film Technicians* (1968) 260 Cal.App.2d 545, 563 [67 Cal.Rptr. 483]; and *Mallard* v. *Boring* (1960) 182 Cal.App.2d 390, 393-394 [6 Cal.Rptr. 171]. Contrary to the defendants' argument, however, these cases did not relieve Boomis of the burden of demonstrating he was acting to protect SERJ. Rather, those cases merely inferred a proper motive from the authority given the particular defendant managers. In light of Shapoff's testimony that Boomis was trying to recoup collateral losses, such an inference is not available here.

In sum then, the trial court's alter ego finding did not prevent the jury from finding Boomis liable for tortious interference with contract, nor did it prevent the trial court from entering judgment on the jury's verdict.

### D. *Boomis's Contract Liability*

Shapoff has not appealed from the trial court's order amending its judgment to relieve Boomis from liability on SERJ's contract. Thus, we have no occasion to pass on the merits of the trial court's determination a defendant may not be held liable both in tort for interference and on the contract as an alter ego. ■ We note, however, that liability as an alter ego is an equitable matter left largely to the discretion of the trial court.[3] (See Witkin, Summary of Cal. Law, *supra*, Corporations, § 13, p. 527.)

### III

### *Procedural Errors*

The defendants spend a great deal of time arguing the trial court had no power to amend its judgment deleting its alter ego finding. Because we have found the alter ego finding would not prevent tort liability, this issue is now moot. ■ We note in passing, however, that the defendants moved for a new trial and a judgment notwithstanding the verdict and that where post-trial motions attacking the judgment have been made, the trial court is not limited to an order granting or denying the relief requested in the moving party's papers. (See *Hamaski* v. *Flotho* (1952) 39 Cal.2d 602, 609-612 [248 P.2d 910]; *Manor Investment Co.* v. *F. W. Woolworth Co., supra,* 159 Cal.App.3d at pp. 597-598; Code Civ. Proc., §§ 662-663.)

### IV

### *Sanctions*

■ Shapoff asks that we impose sanctions under rule 26(a), California Rules of Court. We decline his request. While we have rejected Boomis's

---

[3] Although the courts in *Wise* and *Olivet* held defendants liable both on the contract and in tort, those courts used a conspiracy theory which was not asserted here. (See also *Manor Investment Co.* v. *F. W. Woolworth Co.* (1984) 159 Cal.App.3d 586, 590-592 [206 Cal.Rptr. 37]; *Rosenfeld, Meyer & Susman* v. *Cohen, supra,* 146 Cal.App.3d 200.)

arguments, as our discussion indicates they are not indisputably without merit. Moreover, there is nothing in the record which would suggest this appeal was brought for an improper motive. Accordingly, we have no power to impose sanctions. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].)

Judgment affirmed.

Froehlich, J., and Nares, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 15, 1990.