[Civ. No. 44574. First Dist., Div. Two. June 24, 1980.]

BILL KINSEY, Plaintiff, Cross-defendant and Respondent, v.
MARY MACUR, Defendant, Cross-complainant and Appellant.

COUNSEL

Mary Macur, in pro. per., Camille LeGrand, Blair & LeGrand and Sandra Blair for Defendant, Cross-complainant and Appellant.

Andrew M. Cohen for Plaintiff, Cross-defendant and Respondent.

OPINION

**MILLER, J.**—In this action for invasion of privacy, appellant Mary Macur appeals from a judgment entered upon a nonjury verdict in the amount of $5,000 in favor of respondent Bill Kinsey.

The record discloses that, while respondent Bill Kinsey was in the Peace Corps in Tanzania in 1966, his wife died when they were on a picnic. Kinsey was charged with her murder and spent six months awaiting trial. He was subsequently acquitted. The case attracted some notoriety as evidenced by articles published in TIME magazine. Kinsey later returned to Africa on many occasions in different capacities.

In December 1971, Kinsey met appellant Mary Macur at a cocktail party given by the World Affairs Council in San Francisco. At that time he was a graduate student at Stanford University while Macur worked as a researcher at a medical institute. Afterwards, Kinsey drove Macur to her apartment, and at her invitation he remained to have a drink. They subsequently spent the night together. Kinsey then left for a four- to five-week trip to England. Upon his return, he received a post-card from appellant and they renewed their relationship. On each of the next four weekends they slept with each other.

On April 5, 1972, after Kinsey and Macur had attended the symphony together, they returned to appellant's apartment and went to bed. Kinsey then told Macur that he would no longer be seeing her since a woman was coming from England to live with him. Kinsey testified that she did not ask him to leave, and that he left the next morning with Macur maintaining a "stony silence."

On the other hand, Macur testified that Kinsey went into a "rage" that evening and that he terrorized her. She also claimed that he had lunged at her, and that he had tried to have sexual intercourse with her. She alleged that he finally fell asleep on top of her where he remained for the rest of the night.

After the evening of April 5, appellant wrote Kinsey a "mildly re-criminatory" letter which was "somewhat questioning in tone" but the two did not otherwise maintain any contact with each other. In the fall of 1972, Kinsey accepted a business and study assignment to work in Central Africa. Sally Allen, who was living with Kinsey at this time, ac-

companied him to Africa. Kinsey subsequently married Sally in February of 1973.

Shortly before they left the United States, Kinsey received a letter from appellant addressed to "the most deceitful, fucking, selfish bastard I know." Sally Kinsey also received a letter from Macur which was ostensibly designed to expose Kinsey and his mistreatment of appellant.

During the time the Kinseys were in Africa, they received more letters which had been written by Macur. Some were directed to Bill, while others were addressed to acquaintances who had in turn forwarded them to the Kinseys. In several of these letters, appellant enclosed copies of various magazine articles and documents which she believed supported her claims concerning Kinsey's character. However, other letters contained statements which accused Kinsey of murdering his first wife, spending six months in jail for the crime, being a rapist, and other questionable behavior.

Several letters also contained references to matters which respondent had never disclosed to Macur, and he concluded that she must have broken into his apartment. For example, in one letter, she referred to the presence of marijuana in his apartment. Other letters contained copies of Sally Kinsey's divorce certificate from a previous marriage which was missing from Bill Kinsey's apartment. Macur testified that she had written to London and Cambridge in order to obtain copies of the divorce decree. The trial court concluded that Macur had not broken into respondent's apartment.

Appellant also visited a psychologist whom Kinsey had known while at Stanford. In some letters she suggested that the psychologist tended to agree with her evaluation of respondent.

On July 9, 1973, both Sally and Bill Kinsey filed a complaint for permanent injunction. The complaint prayed for $10,000 in general damages based on mental anguish, suffering and expenses incurred in trying to protect the Kinseys from appellant Macur's reach. A preliminary injunction was stipulated to by the parties on July 30, 1973.

On August 15, 1973, Macur filed a cross-complaint for assault, intentional infliction of emotional distress and conspiracy to cause intentional infliction of emotional distress. An amended cross-complaint further alleged false imprisonment and sought $25,000 general damages

as well as $100,000 punitive damages for each cause of action. On June 28, 1977, after a trial without jury, judgment was entered for Bill Kinsey in the amount of $5,000.

The trial court found that Kinsey did not assault, batter or attempt to rape appellant. The court also denied Macur's cross-complaint for false imprisonment and intentional infliction of emotional and physical distress.

Since the main issues before the court relate to invasion of privacy, a brief review of this tort follows.

Courts now recognize four separate torts within the broad designation of "invasion of privacy": (1) the commercial appropriation of the plaintiff's name or likeness, as codified in Civil Code section 3344, subdivision (a); (2) intrusion upon the plaintiff's physical solitude or seclusion; (3) public disclosure of true, embarrassing private facts concerning the plaintiff; and (4) publicity which places the plaintiff in a false light in the public eye. (Prosser, Law of Torts (4th ed., 1971) § 117, pp. 804-814.) In the present case, only the latter two forms of invasion of privacy are alleged.

As discussed in *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 533 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1], the concept of a legal right to privacy was first suggested in a now famous Harvard Law Review article by Warren and Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193. While they had difficulty tracing a common law basis for the right, Warren and Brandeis expressed the belief that it was mass exposure to the public gaze and not just backyard gossip which provided the *raison d'être* for the tort.

Subsequently, in discussing the right of privacy in the area of public disclosure of embarrassing private facts, Prosser stated: "The disclosure of the private facts must be a public disclosure, and not a private one; there must be, in other words, publicity." (Prosser, Torts, *supra*, § 117, p. 810.)

Thus, except in cases involving physical intrusion, the tort must be accompanied by publicity in the sense of communication to the public in general or to a large number of persons as distinguished from one individual or a few. (*Schwartz* v. *Thiele* (1966) 242 Cal.App.2d 799, 805 [51 Cal.Rptr. 767].) "The gravamen of the tort is unwarranted publica-

tion of intimate details of plaintiff's private life. (*Coverstone* v. *Davies* (1952) 38 Cal.2d 315, 322-323 [239 P.2d 876]; *Schwartz* v. *Thiele, supra*, 242 Cal.App.2d at p. 805.) The interest to be protected is individual freedom from the wrongful publicizing of private affairs and activities which are outside the realm of legitimate public concern. (See *Coverstone* v. *Davies, supra*, 38 Cal.2d at p. 323; *Stryker* v. *Republic Pictures Corp.* (1951) 108 Cal.App.2d 191, 194 [238 P.2d 670].)" (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 828 [134 Cal.Rptr. 839].)

■ Appellant first contends that her mailing of letters to "perhaps twenty [people] at most" was insufficient publicity to justify a finding that respondent's privacy had been invaded. Since these mailings were ostensibly to only a small select group of people, appellant argues that the requirement of mass exposure to the public as opposed to a few people has not been satisfied. Appellant's contention misstates the applicable law.

Appellant relies heavily on *Schwartz* v. *Thiele, supra*, 242 Cal. App.2d 799, for the proposition that there was no adequate publicity in the instant case. While *Schwartz* recites the general rule of publicity, there is nothing in the case which suggests that mailing of more than 30 letters to "perhaps twenty [people] at most" does not satisfy that requirement. In *Schwartz*, a licensed physician wrote a letter to a mental health counselor expressing the opinion that plaintiff was mentally ill and in need of hospitalization and treatment. No invasion of privacy was determined to have occurred.

While it may be true that no California case has defined the number of people necessary to justify a finding of publicity, an examination of some of the cases in this area provides sufficient guidance for the matter before us. In *Porten* v. *University of San Francisco, supra*, the court held that the disclosure by the university of plaintiff's transcript to the State Scholarship and Loan Commission was not a "communication to the public in general." (64 Cal.App.3d at p. 828.) In *Timperley* v. *Chase Collection Service* (1969) 272 Cal.App.2d 697 [77 Cal.Rptr. 782], the defendant wrote a letter to plaintiff's employer informing it of an attorney's bill allegedly owed by plaintiff and threatening legal action against the employee plaintiff. There, a judgment for defendant on demurrer was affirmed by the court which declared that it would have been an invasion of plaintiff's privacy to inform the public generally.

(P. 700.) In both cases, communication was to a single recipient for a specific, nonmalicious purpose.

In the instant case, appellant, in her professed attempts to "tell the whole world what a bastard he is," sought to reach a large group of people whom she knew had nothing in common except the possible acquaintance of Bill Kinsey. Unlike the state commission in *Porten* or the employer in *Timperley*, recipients of appellant Macur's letters comprised a diverse group of people living in several states and totally unconnected either socially or professionally. Recipients of her letters included the Kinseys, their former spouses, their parents, their neighbors, their parents' neighbors, members of Bill Kinsey's dissertation committee, other faculty and the president of Stanford University. Since this court believes these recipients adequately reflect "mass exposure" we decline to yield to appellant's claim of insufficient publicity. To do so, we conclude, would only emasculate the legal remedy available to individuals for the invasion of their privacy by another individual.

As the Supreme Court noted: "Men fear exposure not only to those closest to them; much of the outrage underlying the asserted right to privacy is a reaction to exposure to persons known only through business or other secondary relationships. The claim is not so much one of total secrecy as it is the right to *define* one's circle of intimacy...." (*Briscoe* v. *Reader's Digest Association, Inc., supra*, 4 Cal.3d, p. 534, italics in original.)

Under this standard, appellant clearly has violated Bill Kinsey's right of privacy. While it may be true that there is little to admire in Kinsey's treatment of appellant, this does not justify the harassment of Kinsey and his wife which followed.

We also dismiss appellant's contention that respondent has failed to establish a cause of action under the California Constitution, article I, section 1, which includes the right of "privacy" among the various inalienable rights. Even if this issue were not raised for the first time on appeal, we note that the constitutional amendment added in 1972 was never intended to eliminate the common law tort for invasion of privacy. Rather, as the court held in *Porten*, "[p]rivacy is protected not merely against state action; it is considered an inalienable right which may not be violated *by anyone.*" (64 Cal.App.3d at p. 829, italics added.)

■ Appellant next contends that, even if respondent's privacy had been invaded, the invasion was privileged since Kinsey was a public figure. This status, she contends, was achieved "by virtue of his entry into the Peace Corps and through his trial for the murder of his first wife." Given this "public figure" status, she asserts that she may exercise her constitutional privilege to disseminate critical material if done without malice. (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534].) We disagree.

Contrary to appellant's assertion that "the definition of 'public figure' for the purposes of the qualified privilege to publish is not clearly defined," the United States Supreme Court opinion in the leading case of *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997] is particularly instructive: "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." (P. 345 [41 L.Ed.2d p. 808].)

Additionally, *Gertz* cautioned against lightly assuming "...that a citizen's participation in community and professional affairs rendered him a public figure for all purposes....It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy...." (*Gertz*, 418 U.S. at p. 352 [41 L.Ed.2d at p. 812].)

Under this standard, it is difficult to see how respondent could become a public figure simply because of his participation in the Peace Corps or his employment with the United Nations.

With respect to Kinsey's notoriety by virtue of his trial, respondent was involuntarily thrust into the public limelight through the unfortunate death of his first wife. Offered the opportunity to be released on bail, he declined in favor of waiting some six months in jail for his trial at which time he was acquitted.

In the leading case of *Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91], plaintiff, a prostitute, was charged with murder and acquitted after a very long and very public trial. She abandoned her life of shame, married and assumed a place in respectable society, making many friends who were not aware of the incidents of her earlier life. The court held that she had stated a cause of action for privacy against defendants who had made a movie based entirely on Mrs. Melvin's life some seven years after the trial.

More recently, in *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d 529, the Supreme Court held that a felon who had been convicted and served his sentence was entitled to bring an invasion of privacy action against the defendant for publishing an article about the crime committed some 11 years before. Stressing the state's interest in the integrity of the rehabilitative process, the court notes that "[i]t would be a crass legal fiction to assert that a matter once public never becomes private again." (4 Cal.3d at p. 539.) Since Kinsey, like Mrs. Melvin, had been acquitted of the murder charge, there is a strong societal interest in allowing him "to melt into the shadows of obscurity" once again.

■ Appellant argues that her First Amendment right of freedom of speech has been cut off by respondent's right to privacy. She points out that the "only social sanction available to a person wronged is exposure" noting that "people do not always relate damaging information about others in a detached, rational manner, particularly when they feel they have been victimized."

"'The right "to be let alone" and to be protected from undesired publicity is not absolute but must be balanced against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guarantees of freedom of speech and of the press. [Citations.]'" (*Werner* v. *Times-Mirror Co.* (1961) 193 Cal.App.2d 111, 116 [14 Cal.Rptr. 208].) A review of the contents of Macur's letters yields very little that may be considered to be of public interest.

In *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 36 [81 Cal.Rptr. 360, 459 P.2d 912], the court held that "[i]n determining whether a particular incident is 'newsworthy' and thus whether the privilege shields its truthful publication from liability, the courts consider a variety of factors, including the social value of the facts published, the depth of the

article's intrusion into ostensibly private affairs, and the extent to which the party voluntarily acceded to a position of public notoriety."

Little of what Macur wrote in her letters to the Kinseys and their acquaintances could be considered "newsworthy" under this rule. She falsely accused him of murdering his wife and of having spent six months in jail for the crime. She also implied that in divorcing his second wife, a Catholic, Kinsey had destroyed her life, and that he was prone to raping children. The fact that appellant "believed her own allegations" is not relevant to the issue of newsworthiness. Her admission in her opening brief that she had described her experiences with respondent in "graphic, if hysterical detail" is a gross understatement of the truth.

■ Finally, appellant contends that Kinsey must plead and prove special damages in order to recover under the tort of publicity which places the individual in a false light in the public eye. Respondent pleaded and was awarded general damages in the amount of $5,000 based on mental anguish, suffering, expenses incurred in trying to remove himself and his wife from Macur's reach, and to protect his and his wife's security and ensure her peace of mind.

Appellant correctly points out that in *Werner* v. *Times-Mirror Co., supra*, 193 Cal.App.2d 111, the court held that a plaintiff who alleged a "false light" privacy invasion claim but who had failed to demand a retraction under Civil Code section 48a, could not recover unless he could establish special damages. The code provision essentially requires that in an action for libel against a newspaper the plaintiff shall recover no more than special damages unless a demand has been made and an adequate correction has not been published by the newspaper.

However, under the circumstances of this case, neither the *Werner* case nor Civil Code section 48a is applicable. Respondent based his invasion of privacy claim on both the "false light" and "embarrassing private facts" torts. In *Kapellas* v. *Kofman, supra*, 1 Cal.3d 20, the Supreme Court noted that cases involving the tort of unwarranted publication of embarrassing private facts fell outside the category of cases for which section 48a contemplated coverage. "Since the complaint does not rest upon the inaccuracy of a statement but upon the unwanted publicity resulting from an article, the private party gains no relief from a subsequent retraction or correction of the article but, on

the contrary, suffers additional injury by the repeated exposure." (*Kapellas, supra*, 1 Cal.3d at p. 35.)

Appellant Macur wrote letters reminding others of Kinsey's background in Tanzania and falsely portraying him as a murderer and person of extremely questionable moral character. Subjecting Kinsey to the requirements of the Civil Code would only have exacerbated the invasion of his privacy, given the nature of the accusations and the circumstances of Macur's communicating them. Such a hardship was not intended by the drafters of the statute for plaintiffs such as Kinsey who made adequate allegations of general damages.

The judgment is affirmed.

Taylor, P. J., and Smith, J., concurred.

A petition for a rehearing was denied July 24, 1980, and appellant's petition for a hearing by the Supreme Court was denied August 20, 1980.