**Burt CABANAS, et al., Plaintiffs,**

v.

**GLOODT ASSOCIATES,
et al., Defendants.**

**No. CIV–S–94–1481 DFL PAN.**

United States District Court,
E.D. California.

Sept. 25, 1996.

Jack C. Nickens, Paul D. Flack, Clements, O'Neill, Pierce & Nickens, Houston, TX, for Plaintiffs.

Lawrence G. Townsend, San Francisco, CA, for defendants Gloodt Associates, Peter Gloodt, Karen Johnson and Peter Moegenburg.

## *MEMORANDUM OF OPINION AND ORDER*

LEVI, District Judge.

This case presents important questions concerning the scope of liability of an appraiser to a third party in a novel factual context. Plaintiff is a hotel manager who claims that he was injured by misrepresentations in an appraisal defendants prepared for a lending institution. The novelty of the claims stems from plaintiffs' position that the injury was suffered in his renegotiation of his contract with the hotel owners, not because the owners had seen the appraisal, but because plaintiff feared that they had and therefore believed that his negotiating position had been weakened.

Defendants previously obtained a summary adjudication that plaintiffs' claims for libel, libel per se and disparagement of business, each variations of the tort of defamation, were barred by the qualified privilege of California Civil Code § 47(c). The defendant appraisers move for summary judgment on plaintiffs' remaining claims.[1] Plaintiffs move for reconsideration of the order dismissing the first three claims.

### I. Facts [2]

Plaintiffs Burt Cabanas and BMC—The Benchmark Management Company (Benchmark) manage hospitality properties and conference centers. In 1988, Benchmark entered into a ten-year contract to manage the Resort at Squaw Creek, a resort hotel, recreation and conference center in Placer County, California.

Security Pacific National Bank (now merged with Bank of America) provided $53 million of the initial financing for the Resort. Before the Resort opened in 1990, Security Pacific hired defendant Gloodt Associates, Inc. to appraise the property. Gloodt appraised the property at a value, as of January 1, 1991, of $72 million.

The Resort's performance for the first year of operation was disappointing. Profits were at least $10 million less than Benchmark had estimated. Cabanas Depo., 345. Representatives of the owners were critical of Benchmark's performance. Verrue Depo., 64. A study was commissioned in 1991 by some of the owners; the study, by an entity called Aspen Crest, recommended a chain affiliation rather than an independent man-

---

1. Plaintiffs' amended complaint alleges eleven separate tort theories of recovery: (1) libel, (2) libel per se, (3) disparagement of business, (4) interference with existing contract, (5) conspiracy, (6) negligence, (7) gross negligence, (8) interference with prospective business relations, (9) false light—invasion of privacy, (10) the "prima facie" tort, and (11) intentional infliction of emotional distress.

2. On a motion for summary judgment, all facts are viewed in the light most favorable to plaintiffs.

agement company such as Benchmark. *Id.* at 65–66.

In 1991, Randall Verrue, a representative of one of the principal investors, began to broker a partial change in ownership that would bring in a new group of investors represented by Kenneth Ting and Geoffrey Yeh. Verrue Depo., 57–58, 60–61. Cabanas was told of Verrue's efforts to negotiate an ownership change in January 1992, and around March 1992 was informed that his cooperation, in the form of a restructured management fee agreement, would be necessary to facilitate the ownership change. Cabanas Depo., 241–42. Ting and Yeh felt strongly that the management agreement should provide more incentive for Benchmark to perform well, by linking management fees directly to the Resort's financial success. Verrue Depo., 62. Both the existing owners and Ting and Yeh were critical of Benchmark's first year performance. *Id.* at 64. In order to facilitate the ownership change, Cabanas agreed to renegotiate the management fees. Cabanas Depo., 242–43; *see also* Second Am. to Management Agreement (Cabanas Depo., Exh. 3), 1, ¶ 3 ("WHEREAS, Pacific Squaw Creek, Inc. has required that [Benchmark] agree to a mechanism for adjusting fees payable pursuant to the Agreement as a condition to its acquisition of the general partnership interest of Squaw Creek Investors Corporation in Owner . . . ."). The negotiation was conducted between March and June of 1992.

In March or early April 1992, a maid cleaning a room at the Resort found a copy of a 400–page document entitled "Appraisal of the Resort at Squaw Creek" (the "1992 Gloodt report"). Cabanas Depo., 263. The report, prepared by the defendant appraisers[3] for Security Pacific, included statements that Benchmark was not considered to be a competent manager of the Resort, described reasons why Benchmark should be replaced, valued the Resort as worth $17.9 million more if Benchmark were replaced, and estimated the legal costs involved in replacing Benchmark.[4] The maid gave the report to the executive housekeeper, who saw comments about Benchmark and gave the report to the general manager. *Id.* at 262–63. The manager, John Russell, then called Cabanas in Texas and told him that a report critical of Benchmark, including "lies, untruths, comments about Benchmark being incompetent" had been found. *Id.* at 262–63, 267. Cabanas then asked that copies be made of the offending portions of the report. *Id.* at 267. Later that day, possibly within two hours, the guest came to the front desk and retrieved the report.[5] *Id.* at 273. The excerpts of the report were kept by Benchmark, and a copy was sent to Cabanas in Texas. When Cabanas asked whether Verrue had seen the report, Russell told him that "he had seen a copy of an appraisal that Mr. Verrue had." *Id.* at 235.

While Cabanas would have accepted a lower fee in any event, he felt that the discovery of the 1992 Gloodt report weakened his bargaining stance. Cabanas testified that the report "[d]efinitely put me at a negotiating disadvantage with that unknown. Yes, unknown whether Verrue had it or didn't have it and assuming that he had it." Cabanas Depo., 392.[6] Between fifteen and sixty days after the report was found by the maid,

3. In addition to Gloodt Associates, Inc., three individual appraiser employees of Gloodt are named as defendants. For convenience, the defendants will be collectively referred to as "the appraisers."

4. The report was provided by Gloodt directly to Security Pacific, who had requested that Gloodt appraise the property under two scenarios, one with Benchmark continuing as manager, the other with a hypothetical, competent chain-affiliated management company. Security Pacific provided copies of the report to others with a professional interest in the value of the property. *See* discussion in Order filed December 22, 1995, 4–7.

5. Although there is apparently a computerized guest register at the front desk of the Resort, plaintiffs have offered no evidence as to who the guest was. *See* Cabanas Depo., 271–73. According to Cabanas, the general manager initially assumed that the guest was from Gloodt. *Id.*

6. *See also id.* at 397 ("I did not feel that I was on an even plane after the Gloodt report and I was paranoid about the fact that Mr. Verrue had it . . . ."), 308 (Cabanas's willingness to negotiate terms affected by "my perceived thought that [Verrue] had seen [the 1992 Gloodt report]").

Cabanas verified that Verrue had seen the 1990 appraisal, but did not ask whether Verrue had seen the allegedly damaging 1992 Gloodt report. Cabanas Depo., 234–36; Verrue Depo., 79. Although he believed that Verrue had a copy, Cabanas preferred not to discuss the statements in the 1992 Gloodt report, because he felt that it would not serve any positive purpose in the negotiation, and "would rather keep it in the dark." Cabanas Depo., 309–11.

After the re-negotiation of the management agreement was concluded, allegedly on terms less favorable to Benchmark, Cabanas raised the subject of the 1992 Gloodt report with Verrue. Verrue denied that he had seen the report. In March 1993, Cabanas brought this action against the appraisers.

## II. Defamation Claims (Motion for Reconsideration)

■ Plaintiffs move for reconsideration of the order filed December 22, 1995, arguing that there is sufficient evidence to justify a jury finding of "malice" defeating the qualified privilege of Civil Code § 47(c).[7] Plaintiffs concede that they cannot show that "the publication is motivated by hatred or ill will toward plaintiff," *Brewer v. Second Baptist Church,* 32 Cal.2d 791, 797, 197 P.2d 713 (1948), *quoted with approval in Agarwal v. Johnson,* 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58 (1979), instead they contend that the privilege does not apply because (1) the appraisers lacked a reasonable basis for their conclusions; (2) the statements made exceeded the scope of the interest; (3) the appraisal exceeded the scope of an "ordinary" appraisal; and (4) the appraisers had an improper motive.

### A. *Lack of Reasonable Basis*

Plaintiffs assert that the following evidence shows that the appraisers were either inten-

tionally lying or "lacked a reasonable basis" for the statements:

1. The Appraisal essentially ignores the obvious reasons for the Resort's poor performance, such as the facts [sic] that it was the first year of the Resort's operation, there was no snow for skiing, the failure to complete the golf course on time, and the recession." Reconsideration Mot., 7; *see also* Opp. to First Summary Judgment Mot., 15.

2. "The comparables used are not true comparables." Reconsideration Mot., 7.

3. "Gloodt assumed that management was competent just one year earlier." *Id.*

4. "Hospitality Valuation Services concluded that Benchmark was generally competent and even recognized the possibility that beyond being merely competent, Benchmark may have been 'the ideal operator of the property.'" Suppl.Mem. in Support of Reconsideration Mot., 4.

5. Plaintiffs' expert's opinion is that the defendants did not conduct "a thorough evaluation of management's capabilities," and that defendants "do not appear to have the proper qualifications ..." Opp. to First Summary Judgment Mot., 16.

6. Plaintiffs' expert's opinion is that the "analysis set forth in the Appraisal [does] not provide a reasonable basis for the Appraisal's conclusions ..." Suppl.Lattin Decl., 2, ¶ 3(d).

Taken as a whole, this evidence fails to establish the improper motive necessary to defeat the qualified privilege.

■ Negligence is not malice. It is not sufficient to show that the statements in the report were inaccurate, or even unreasonable. Only willful falsity or recklessness will suffice. "It is only when the negligence

---

7. To defeat the qualified privilege of Civil Code § 47(c), plaintiffs must show that defendants' statements about them were made with "malice." "Malice" here means "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." *Lundquist v. Reusser,* 7 Cal.4th 1193, 31 Cal.Rptr.2d 776, 782, 875 P.2d 1279, 1284 (1994) (citations omitted). "Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff, or by any cause other than the

desire to protect the interest for the protection of which the privilege is given." *Agarwal v. Johnson,* 25 Cal.3d 932, 160 Cal.Rptr. 141, 149, 603 P.2d 58, 66–67 (1979) (citations omitted). Malice may also be established by showing that defendants "lacked reasonable grounds to believe the statement true and therefore acted with reckless disregard for plaintiff's rights." *Cuenca v. Safeway San Francisco Employees Federal Credit Union,* 180 Cal.App.3d 985, 225 Cal.Rptr. 852, 858 (1986) (citations omitted).

amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown." *Roemer v. Retail Credit Co.*, 3 Cal.App.3d 368, 83 Cal.Rptr. 540, 543 (1970).

■ Plaintiffs' first argument that defendants had "no reasonable grounds" for their statements has been rejected before, and its repetition here is frivolous. References appear throughout the appraisal to the Persian Gulf War, the California recession, the lack of golf or skiing, and to the fact that the Resort was in its first year. That these factors were not given more weight in explaining the estimated seven million dollar loss does not mean that they were ignored altogether, or that defendants recklessly disregarded the "truth" about the impact these factors had on the resort's performance. Nor have plaintiffs shown how much effect they contend a reasonable appraiser would have given these factors. Plaintiffs have not shown negligence, much less malice. No jury could find the appraisers' statements groundless on this basis.

■ The second contention is similarly unavailing. Plaintiff's expert's supplemental opinion is that comparing the Resort with three Rocky Mountain hotel properties was "inappropriate," because those resorts (a) were "probably not conference oriented," (b) had higher occupancy rates in part because there are more established resorts there and better snow conditions, and (c) were not in their first year of operation. Lattin Supp. Decl., 2, ¶ 3(a)–(c). No jury could reasonably infer that an "inappropriate" comparison proves that a statement was recklessly or intentionally false. Indeed, on Cabanas's personal view no appraisal could ever have been done: "[t]here are no comparables to the Resort at Squaw Creek." Cabanas Depo., 119. Likewise, plaintiffs' complaint that the report was not "thorough," and that the appraisers were not qualified, can show only negligence, if that.

■ As to the third contention, it is true that Gloodt assumed in conducting the first appraisal that Benchmark would prove competent to the task of managing the Resort. This assumption was normal for appraisers, and in light of the fact that the Resort was not yet operating, was not unreasonable. Gloodt's decision to change the assumption after reviewing the Resort's staggering first year losses does not amount to recklessness. When offered in support of a "reckless disregard of truth" theory, this third fact is not even relevant.

■ The fourth contention seeks to show recklessness by comparison to the subsequent appraisals performed by Hospitality Valuation Services ("HVS"). The comparison, however, does not prove recklessness, and in fact shows that defendants had reasonable grounds for their statements about Benchmark's competence in managing the Resort. Mark Lukens reviewed the 1992 Gloodt appraisal for five or six days for Bank of California. He then conducted a full appraisal for Bank of California. He "was shocked to see just how poor the results were in the initial months of opening," and attributed the poor results to "bad market, bad weather, as well as I think during the first year, in particular, that management didn't know what they were doing." Lukens Depo., 52. Lukens explained that he was "actually very careful" not to include statements in his appraisal about Benchmark's competence, because he was "aware of this lawsuit ... and "didn't want to get pulled into a lawsuit." *Id.* at 55–56. Indeed, he emphasized factors such as the low snowfall and lack of golf facilities because "we were concerned about the situation between Benchmark and Gloodt, and we were trying to avoid any language indicating that Benchmark was ineffective." *Id.* at 88. A reasonable fact-finder could not infer from HVS' tepid evaluation of Benchmark—"Based upon the performance of Benchmark to date, it is difficult to say whether they are the ideal operator of the property"—that HVS believed Benchmark might in fact be the ideal operator of the property, that defendants were thus unreasonable to the point of recklessness in asserting that they were "not competent managers" of the Resort, and that therefore defendants acted with malice when they made the assertion. Indeed, HVS' reaction to this lawsuit and its careful tailoring of

its report in light of the lawsuit is a vivid demonstration of the importance of the privilege in permitting a free flow of accurate economic information.

■ Finally, plaintiffs present their expert's "supplemental" opinion concluding that the appraisers lacked a reasonable basis for their conclusions. The court refuses to consider this evidence on a reconsideration motion. Plaintiffs have not shown any reason why this opinion could not have been presented at the time this motion was first heard. Alternatively, the opinions in the declaration are rejected because they are mere conclusions unsupported by explanation. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989) (expert opinion that certain practices were "unreasonable and inappropriate" insufficient to avoid summary judgment, since declaration failed to show "process of reasoning beginning from a firm foundation" which would provide opportunity to analyze factual basis for opinion).

In sum, there is no evidence of "wilful disregard for or avoidance of accuracy." *Roemer,* 83 Cal.Rptr. at 543. Plaintiffs' evidence, which could establish only negligence, if that, fails to defeat the qualified privilege. Plaintiffs' insistence that they are entitled to a jury if there is any disagreement as to the accuracy of the opinions stated would reduce the privilege, in Justice Jackson's words, to "a munificent bequest in a pauper's will." *Edwards v. California,* 314 U.S. 160, 186, 62 S.Ct. 164, 172, 86 L.Ed. 119 (1941) (Jackson, J., concurring).

## B. *Beyond the Scope of the Interest*

■ Plaintiffs contend that the following two statements, each of which appears twice in the report, exceed the scope of the Bank's interests so as to nullify the privilege:

Benchmark does not have the necessary experience or resources to effectively manage or market a resort with the highly variable occupancy pattern like the Resort at Squaw Creek in a manner that will ensure a level of success similar to comparable properties operated under chain affiliated programs.

[T]he marketing and management abilities of Benchmark are inadequate to the challenges of a multi-function destination resort such as the Resort at Squaw Creek. Plaintiffs complain that these statements exceed the scope of the interest because they comment on Benchmark's competence in managing resorts in general, rather than its competence in managing the Resort at Squaw Creek. Plaintiffs emphasize the phrase "manage ... a resort ... like the Resort at Squaw Creek" and "challenges of a ... resort such as the Resort at Squaw Creek" to show that these comments were not limited to Benchmark's performance at the Resort alone, but extended to all Resorts "like" the Resort at Squaw Creek.

Plaintiffs' argument fails on two grounds. First these two sentences in a 157–page report are not fairly read to comment on plaintiffs' competency as a general matter. And, second, if the two sentences can be read to comment on plaintiffs' ability to run resorts like the Resort at Squaw Creek, this information is highly relevant to the Bank's evaluation of the management and thus to its interest. Any statement reasonably calculated to protect that interest falls within the scope of the privilege. *See e.g., Deaile v. General Telephone Co. of Cal.,* 40 Cal.App.3d 841, 115 Cal.Rptr. 582, 585 (1974). As stated in the prior order, the Bank had a $53 million dollar interest in whether Benchmark was competently managing the Resort. While defendants could not claim the privilege had they included, along with protected communications, matters that were "immaterial," *Deaile,* 115 Cal.Rptr. at 585, or matters that the Bank would be interested in only "as a matter of gossip or curiosity," *Institute of Athletic Motivation v. University of Ill.,* 114 Cal.App.3d 1, 170 Cal.Rptr. 411, 417 (1980), they included no such statements. Information about whether Benchmark's abilities were adequate to manage "a multi-function destination resort such as the Resort at Squaw Creek" or about whether Benchmark had the necessary experience to effectively manage resorts "like the Resort at Squaw Creek" was information that the Bank was directly interested in, because such information would inform the Bank about the likelihood that Benchmark would effectively man-

age this resort. In short, the scope of the privilege was not exceeded.

## C. *Not an "Ordinary" Appraisal*

■ Benchmark's "not an ordinary appraisal" argument is irrelevant to application of the privilege.[8] The question in determining whether the privilege exists is not whether defendants went beyond the "proper purpose" of an ordinary appraisal. It is whether the Bank had a legitimate interest in the subject matter of the communication. Thus, even if the value of the property under current management would not be relevant to a third party purchaser—the "usual" or "normal" appraisal standard of valuation—it was directly relevant to the Bank's interests. So long as the owners showed no intention of terminating Benchmark, the more important valuation of the Bank's collateral would be the "Benchmark scenario," a scenario that left the Bank under-secured by fourteen million dollars. An appraisal evaluating the effect of Benchmark's management on the value of the Resort would be "reasonably calculated" to protect the Bank's interests.

## D. *Improper Motivation*

■ Plaintiffs' argument that the appraisers were improperly motivated is somewhat difficult to pin down. Plaintiffs do not identify a specific motivation, instead choosing to identify facts that they believe lead to a conclusion of some improper, but unidentified, motive.

At least some of these facts are directed at showing that defendants were conducting something other than an "ordinary" appraisal. As discussed above, if this was an unusual appraisal, which seems unlikely, it did not exceed the scope of the 47(c) privilege. So long as the information was reasonably calcu-

lated to protect the Bank's interests, an unusual appraisal is protected to the same extent as an ordinary one.

Other facts could lead a jury to conclude that the appraisal industry standard of independence was violated through the Bank's involvement in the editorial process.[9] However, even if the appraisal was not "independent," this does not show improper purpose. If the Bank requested that information be presented in a form other than an appraisal conforming to industry standards, the appraisers could oblige that request, still acting with the intent to provide information in which the Bank has an interest. Without more, the alleged violation of appraisal industry standards of independence does not show that the appraisers acted from a motive other than to provide the Bank information about the value of the Resort under Benchmark management. Indeed, acquiescence in the Bank's request, if anything, tends to show an intent to accommodate and address the Bank's expressed interest.

Finally, plaintiffs contend that both the owners and the Bank were "highly motivated" to blame Benchmark for the poor first year performance of the Resort. Even were there evidence that either the Bank or the owners had such a motive, however, this theory fails to show that the *appraisers* had any motive for creating the report other than to inform the Bank.

## III. Intentional Interference with Existing Contract and Prospective Business Relations

Plaintiffs claim that the appraisers, by creating a report so critical of Benchmark, tortiously interfered with their contract or prospective business relations with the owners. Plaintiffs have two factual theories in support of these claims: (1) that the owners were

---

8. This category of arguments includes the arguments that (1) the appraisal states that the Benchmark scenario "would not be relevant to valuation"; (2) Gloodt testified that "[t]he issue of competent and not competent is really not an appraisal issue"; and (3) the appraisal is "unusual," does not follow "normal or proper appraisal methods," and evaluates management, an issue outside the scope of a "normal" appraisal. Reconsideration Mot., 6.

9. In support of this theory, plaintiffs offer the following evidence:

1. The Bank's alleged request that the appraisers "Hammer Benchmark all in one place."
2. The Bank's alleged request that the appraisers emphatically state that Benchmark is incompetent.
3. In plaintiffs' expert's opinion, the appraisal violates appraisal standards of independence.

given the report and negotiated plaintiffs' contract with the appraisers' criticisms in mind, or (2) that while the owners did not have the report, Cabanas reasonably believed they did, and negotiated a less favorable contract as a result. The first theory fails because plaintiffs lack evidence showing that Verrue had the report; the second theory fails because defendants' conduct in preparing the report for the bank was privileged under the "advisor's privilege." [10]

### A. Theory # 1: Verrue had the report

■ Plaintiffs' first theory of interference is that the owners themselves were provided a copy of the report, either by the appraisers or by the bank. According to this theory, Benchmark's contract was renegotiated on terms less favorable to Benchmark because Randall Verrue, the owner's representative, had a copy of the report. This theory is not supported by evidence from which a jury could reasonably so find.

During the negotiation, Cabanas did not ask Verrue whether he had seen a copy of the report. After an agreement was reached, Cabanas asked Verrue about the report, and Verrue denied having seen it. Verrue also testified at his deposition that he had not seen the report at the time. Verrue Depo., 71–72. Despite these undisputed facts, plaintiffs claim a jury could infer that Verrue had the report based on three facts.

First, Verrue did read a copy of the earlier 1990 appraisal by Gloodt, which he may have received from Security Pacific. But this fact hardly establishes that the bank had a pattern of supplying Verrue with appraisals or reports, and without more is insufficient for a jury to infer that a copy of any report given to the bank also went to Verrue, particularly in view of Verrue's denial.

Second, Verrue allegedly determined to restructure the management agreement in March 1992, the same month that defendants provided the 1992 report to the bank. *See* Verrue Depo., 59 (Verrue "would estimate" that decision to renegotiate was made in March 1992). But even Cabanas testified

that the renegotiation would have taken place even if no report had been drafted: the renegotiation of the management agreement was part of the larger transaction involving the partial change in ownership. Especially in light of these undisputed facts showing why Verrue's decision was made when it was, the coincidence of Verrue's decision and Gloodt's delivery of the report to the bank does not suggest that Verrue received a copy.

Finally, plaintiffs contend that a jury could infer Verrue's knowledge of the report because the bank was entitled to review any significant change in the management agreement. Plaintiffs present no evidence that Security Pacific discussed the renegotiation of the management agreement with Verrue at any time, or provided Verrue with a copy of the allegedly damaging report.

Plaintiffs lack any evidence that Verrue had the report at the time the management fee agreement was renegotiated. Plaintiffs thus cannot establish that the report led Verrue to renegotiate the contract on terms less favorable to Benchmark. Without such evidence of causation, this first factual theory of intentional interference with existing contract and intentional interference with prospective business relations fails.

### B. Theory # 2: Existence of report caused Cabanas to negotiate less favorable deal

Plaintiffs' second factual theory is that by advising the bank that plaintiffs were not competently managing the Resort, the appraisers intended to cause the owners to renegotiate or breach the management contract. According to this theory, the appraisers could foresee that the bank might protect its security interest in the Resort by encouraging the owners to breach or renegotiate, perhaps in connection with the owner's request for needed refinancing. Plaintiffs claim that the foreseeable harm—less favorable management fees—occurred by unforeseeable means, when Benchmark received a copy of the report from an unknown source, and took a less aggressive bargaining position as a result.

---

**10.** No advisor's privilege would attach if the appraisers sent the report directly to the owners, since the appraisers did not work for the owners, and the owners did not request the information.

In response to this theory, the appraisers raise the advisor's privilege under which advice by one who advises another to breach a contract with a third party is privileged so long as the advisor is motivated in part by the best interests of the person advised.[11] Plaintiffs argue that the advisor's privilege does not apply unless the advice is a party to the contract. Neither party has cited authority on the particular issue involved here: whether, under California law, advisors are protected by the privilege when they give advice to a non-contracting party with a direct financial interest in the performance of the contract.[12]

Not every interference with contract or economic advantage is a tort. For conduct to be actionable under the tort of interference with prospective economic advantage, the conduct must be wrongful by some independent measure. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995). The tort of interference with contract does not have a defined "wrongfulness" requirement, but California courts have limited the application of the tort by allowing the affirmative defenses of "justification" and "privilege." These requirements are each variants of the basic requirement that the interfering conduct be "improper." Rest.Torts 2d, § 767, comment b.

"The existence and scope of the privilege to induce a breach of contract must be determined by reference to the societal interests which it is designed to protect." *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 325 (9th Cir.1982) (citations omitted). The advisor's privilege is not simply, as plaintiffs contend, a derivative of the principle that corporations can only act through their agents. Opp. to Mot. re: Remaining Claims,

8, n. 8. It is designed "to protect the important interests served by the confidential relationship between a fiduciary and his principal." *Los Angeles Airways*, 687 F.2d at 325.[13]

The Bank was entitled to interfere with the management contract in order to protect its interests. It goes without saying that a default on a $53 million loan to the Resort's owners would significantly affect the Bank's interests. Like the Restatement, California law permits those who have a financial interest in the performance of another's contract to act to protect that interest, so long as they do not employ improper means. *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.App.3d 13, 144 Cal.Rptr. 664, 670 (1978); *Sade Shoe Co., Inc. v. Oschin and Snyder*, 162 Cal.App.3d 1174, 209 Cal.Rptr. 124, 127 (1984); *Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 37, 112 P.2d 631 (1941); Rest.Torts 2d, § 769. The interest of a mortgage lender is a "financial interest" within the scope of the established privilege. *Id.* comment c; *see e.g., Nitzberg v. Zalesky*, 370 So.2d 389, 390–91 (Fla.Dist.Ct.App.1979) (lender privileged to tell borrower to "cut back on overhead," even if that resulted in reduction of corporate officer's salary). Thus, the bank legitimately could interfere in the management contract to protect the value of its collateral. *See also Pankow Construction v. Advance Mortgage Corp.*, 618 F.2d 611 (9th Cir.1980); *East Bay Ltd. v. American Gen. Life & Acc. Ins.*, 744 F.Supp. 1118, 1121 (M.D.Fla.1990) (applying same rule under Florida law; lender was entitled to require that any prospective purchaser of lendee's interest possess adequate management experience for particular type of property involved, in order to protect lender's contractual rights in loan).

---

11. The motion for leave to amend to add this defense to the answer is unopposed by plaintiffs, and is granted.

12. The cases cited by plaintiffs, *Shapoff v. Scull*, 222 Cal.App.3d 1457, 272 Cal.Rptr. 480 (1990) and *Klein v. Oakland Raiders, Ltd.*, 211 Cal. App.3d 67, 259 Cal.Rptr. 149 (1989), are not on point. For example, the phrase "the 'advisor's' privilege ... [which] requires a defendant to demonstrate that he was acting on behalf of the contracting party," *Shapoff*, 272 Cal.Rptr. at 486,

appears to require that the advice be a contracting party. However, the issue in *Shapoff* was whether the advisor was acting on the advice's behalf. *Id.* 272 Cal.Rptr. at 484–88.

13. California law also encourages such candor in communications to those who advise interested parties by protecting the advisor from liability from defamation and related claims through the qualified privilege. Cal.Civ.Code § 47(c).

■ The Bank was also entitled to seek advice on how best to protect its interest, and it would seem to follow that its advisors must be protected by the privilege. The Restatement protects honest advice to contracting parties, stating that it is not improper to interfere with a contract if one gives "honest advice within the scope of a request for the advice." Rest.Torts 2d § 772(b).

> The rule as to honest advice applies to protect the public and private interests in freedom of communication and friendly intercourse. Thus the lawyer, the doctor, the clergyman, the banker, the investment ... counselor, and the efficiency expert need this protection for the performance of their tasks ... [T]he rule protects the amateur as well as the professional adviser.

*Id.* comment c. It is not necessary that the advice given be truthful or even reasonable, only that it be given in good faith. *Id.* comment e; *Estate of Albergo,* 275 Ill.App.3d 439, 211 Ill.Dec. 905, 913, 656 N.E.2d 97, 105 (1995) (argument that "improper standard" was used by hospital bill review service in advising insurer not to pay claim rejected as irrelevant where no evidence of bad faith). California law is in accord. *Walsh v. Glendale Fed. Sav. & Loan Ass'n,* 1 Cal.App.3d 578, 81 Cal.Rptr. 804, 811 (1969) (privilege for honest advice does not apply to false and fraudulent misrepresentations); *see also* Rest.Torts 2d 770 (privilege for one charged with responsibility for the welfare of another). Nothing in the rationale for the "honest advice" privilege indicates that it should be limited to those who advise contracting parties, but withheld from those who advise financially interested parties.

The Bank's need for frank and honest advice on how to protect its interests outweighs Benchmark's interest in the stability of its contract.

■ The court therefore concludes that, if faced with the issue, the California Supreme Court would extend the advisor's privilege beyond those who advise contracting parties, at least where the advisor, motivated in part by a desire to protect the principal's interest, is providing advice to a person with a direct financial interest in the performance of the contract. *Cf. Klein v. Oakland Raiders, Ltd.,* 211 Cal.App.3d 67, 259 Cal.Rptr. 149, 158 (1989) (quoting law review article with approval where article distinguished between employee dealing "with his employer's contracts" and employee meddling "with contracts to which his employer has no rightful interest"). "Financial interest" is limited in this context to those having an interest "in the nature of an investment," such as creditors, bondholders, or stockholders, but not competitors or suppliers. *See* Rest.Torts 2d, § 769, comment c and illus.

■ This test is satisfied here. The Bank loaned the owners $53 million for construction. The loan was secured by a deed of trust on the property, and the property's highest value was as an operating resort.[14] The Bank had a definite financial interest in the profitability of the Resort, and by extension, Benchmark's competence as manager of the Resort. While the Bank had not itself contracted for Benchmark's services, it had a clear interest in the performance of the management services contract.

To protect this interest, the Bank requested advice on the value of the Resort. After consultation with its advisors, the Bank requested further information on the effect of Benchmark's contractual relationship on the value of the Resort. As discussed above in section II (Defamation), all of the allegedly damaging statements were within the scope of the professional interest of the Bank.

Further, the evidence here is undisputed that the advice was motivated wholly, or at

---

**14.** Specific contractual provisions in the loan agreement were also addressed to this issue. The agreement provided that the owners could not "enter into any agreement providing for the management, leasing or operation of the Property, other than the Management Agreement ... without the Bank's prior written consent, which may be withheld in Bank's sole and absolute discretion." Verrue Depo., Exh. 3 (Construction Loan Agreement dated July 14, 1988), 38, ¶ 10.7. On June 24, 1992, the Bank and the owners agreed to extend the loan, and modified the language in paragraph 10.7 to add "or enter into any amendment to the Management Agreement ..." Verrue Depo., Exh. 4 (Extension and Sixth Modification Agreement, dated June 24, 1992), 9, ¶ 3.13.

least in part, by an intent to protect the Bank's interests. *See Los Angeles Airways,* 687 F.2d at 328 (advisor's privilege applies if advisor was motivated, at least in part, by desire to benefit principal); *Albergo,* 656 N.E.2d at 104–105 (citing Rest.Torts 2d, § 772, comment c; whether consultant was paid is immaterial to whether advice was motivated by desire to protect interest). If anything, plaintiffs contend that the appraisers were too partial to the Bank's interests and insufficiently neutral or detached. There has been no showing that defendants acted solely from any motive other than to keep the Bank informed.

Because defendants' conduct here was privileged as a matter of law, plaintiffs' claims for interference with contract and interference with prospective business relations are dismissed.

### IV. Conspiracy

As plaintiffs concede, "conspiracy" is not an independent basis for liability. Since plaintiffs have not shown that defendants conspired with anyone who committed a tort, or that defendants themselves committed a tort in furtherance of a conspiracy, this claim is dismissed.

### V. Negligence and Gross Negligence

Plaintiffs next assert that the 1992 Gloodt report was negligently investigated, violated independent appraisal standards, and was negligently distributed. Plaintiffs contend that the appraisers are liable because it is entirely foreseeable that their negligence in rendering service to the Bank would affect the contract between the owners and Benchmark. In response, defendants claim they have no duty to avoid such negligent interference.[15]

Whether a defendant owes a duty to a plaintiff is a question of law. *Bily v. Arthur Young and Co.,* 3 Cal.4th 370, 11

15. Plaintiffs' theory rests on Cabanas' alleged reliance on the report in the negotiations by way of his assumption that Verrue may have seen the report. Thus, the theory of recovery does not assert that anyone relied on the report's alleged misrepresentations but that Cabanas feared that someone might. In this respect the theory of recovery differs from the situation presented in

Cal.Rptr.2d 51, 67, 834 P.2d 745, 761 (1992). The court must therefore determine whether an appraiser, when conducting an appraisal of a going-concern, owes a duty to the manager or owner of the property not to negligently harm its interests.

The general rule in California is against finding such a duty.

[T]he courts have quite consistently refused to recognize a cause of action based on negligent, as opposed to intentional, conduct which interferes with the performance of a contract between third parties or renders its performance more expensive or burdensome.

*Fifield Manor v. Finston,* 54 Cal.2d 632, 7 Cal.Rptr. 377, 379, 354 P.2d 1073, 1075 (1960). This general rule against recovery for negligent interference with contract or prospective economic advantage is subject to one exception: where there is a "special relationship" between the parties. *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 157 Cal.Rptr. 407, 410, 598 P.2d 60, 62–63 (1979); *see also J'Aire Corp. v. Gregory,* 86 Cal.App.3d 499, 150 Cal.Rptr. 329, 331 (1979) (same case). Whether such a special relationship exists is determined by examining six factors:

(1) the extent to which the transaction was intended to affect the plaintiff;

(2) the foreseeability of harm to the plaintiff;

(3) the degree of certainty that the plaintiff suffered injury;

(4) the closeness of the connection between the defendant's conduct and the injury suffered;

(5) the moral blame attached to the defendant's conduct; and

(6) the policy of preventing future harm.

*Id.* 150 Cal.Rptr. at 331–32; *Biakanja v. Irving,* 49 Cal.2d 647, 650, 320 P.2d 16 (1958). The majority of these factors point to a finding of no duty in this case.

*Bily v. Arthur Young and Co.,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745 (1992) and similar cases in which a third party relies on an auditor's report. Under *Bily* defendants would not be liable to a third party such as Cabanas for negligent misrepresentation because Cabanas was not of a class of persons intended to be benefitted by the appraisal engagement.

■ As to the first factor, it is not at all obvious that an updated appraisal, commissioned by a bank for its own underwriting purposes, will affect the interests of the property's manager in a continuing relationship with the property's owner. The transaction between the appraisers and bank, even if defined as "advising Security Pacific on whether Benchmark should be retained as manager," was not intended to benefit Benchmark.

■ The second factor is somewhat in favor of plaintiffs: it was foreseeable that a damaging report about Benchmark's competence might lead to an unfavorable renegotiation of Benchmark's management fees. However, foreseeability is considerably less important as a determinant of duty where the harm is intangible, rather than physical. *Bily*, 11 Cal.Rptr.2d at 67–68, 834 P.2d at 761–62. In *Bily*, the California Supreme Court refused to impose a duty of care on accountants to those foreseeably harmed by their negligent valuation of a business. A duty based upon negligence was limited to the accountant's client alone. *Id.* The mere foreseeability of harm to plaintiffs is therefore entitled to little weight.

The third factor—the degree of certainty that plaintiffs suffered injury—weighs against plaintiffs. It is not at all clear whether Benchmark suffered injury or what the amount of the injury was. The renegotiated fee contract was not a fixed amount lower than the previous agreement. Instead, it provided for a new incentive structure. Based on the actual performance of the Resort over the ensuing two years, Benchmark is able to say with certainty how much less it was paid, but at the time of the negotiation, there was no way of determining with certainty how the Resort would perform. A new contract with lower guaranteed fees but a higher rate of return could be favorable or unfavorable.

Moreover, Cabanas testified that even if he had not known about the report he would have given up "somewhere in the neighborhood of 25 to 30 percent of what we were earning, which equates to about $150 to $200,000 over the next year's period of time, year to 18 months' period of time." Cabanas

Depo., 395. Cabanas is the only person who can testify as to how much the knowledge of the report affected his negotiation. The subtle effect on Cabanas's negotiating stance cannot be measured with any degree of certainty. Cabanas could have determined not to let the report affect his negotiation, or even to negotiate more aggressively in case Verrue made an issue of the report. This case is thus unlike *J'Aire*, where there is no question that the third party's business was closed, or *Earp v. Nobmann*, 122 Cal.App.3d 270, 175 Cal.Rptr. 767, 779 (1981), *overruled on other grounds by Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365 (1990), where a real estate broker's negligent conduct led immediately to a dispute which prevented the seller from transferring the property to anyone. Appraisers have been protected from far less speculative claims that their breach of professional duty caused damage. For example, in *Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal.App.3d 1089, 283 Cal.Rptr. 53 (1991), the court held that a bank's appraisal department owes no duty to the borrower to appraise the property accurately. The mere foreseeability of harm to Benchmark is less important in light of the lack of certainty as to the degree of harm, and as to whether Benchmark's economic advantage was harmed at all. *Id.* 283 Cal.Rptr. at 59.

As discussed above, there is little if anything to connect Benchmark's alleged conduct (a negligent investigation) to the harm suffered. Thus the fourth factor is against plaintiffs.

■ Conduct has been found morally blameworthy under the fourth factor where the conduct approaches recklessness. In *J'Aire*, the defendant's lack of diligence was found "particularly blameworthy since it continued after the probability of damage was drawn directly to [his] attention." *J'Aire*, 157 Cal.Rptr. at 410, 598 P.2d at 63; *see also Earp*, 175 Cal.Rptr. at 780 (moral blame is acute where defendant knew of the damages being suffered "yet he continued in his harmful course of conduct," choosing the course "which would result in personal profit."). A negligent report, if indeed the report was negligent, is not in itself "morally blamewor-

thy," in the sense of reckless, even if it explains that a contract should be breached or a manager replaced.

Finally, as to the sixth factor, public policy is against recognizing a duty here. The privilege in Civil Code § 47(c) and in the advisor's privilege reflects the public policy of promoting frank discussion and exchange of information between interested speakers without the fear of subsequent tort liability. *See Worldvision Enterprises v. American Broadcasting Cos.*, 142 Cal.App.3d 589, 191 Cal.Rptr. 148, 152–53 (1983) (finding no special relationship under *J'Aire*, in part by reference to § 47(c) standards). There is no strong public policy in protecting the negotiating posture of a third party who does not even rely on the information and alleged misrepresentations in an appraiser's report.

For these reasons, defendants owed no duty to Cabanas and the negligence and gross negligence claims fail.

VI. False Light—Invasion of Privacy

■ The privacy tort of "false light in the public eye" is committed when a defendant gives a plaintiff "unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false," such that plaintiff is "placed before the public in a false position." 5 B.E. Witkin, *Summary of California Law*, Torts § 584, at 681 (9th ed. 1988). An essential element is that there be "sufficient publicity"—"communication to the public in general or to a large number of persons as distinguished from one individual or a few." *Kinsey v. Macur*, 107 Cal.App.3d 265, 165 Cal.Rptr. 608, 611 (1980).

The determination of sufficient publicity does not depend exclusively on the number of people with whom defendants communicate, but also on the relative interests involved. Where a communication is made to several individuals or companies with a professional interest in the subject matter of the communication, the total number involved is not determinative.

In *Kinsey*, defendant wanted to "tell the whole world what a bastard [plaintiff] is." *Kinsey*, 165 Cal.Rptr. at 612. The letters were sent to Kinsey, his wife, their former spouses, their parents, their neighbors, their parents' neighbors, members of Bill Kinsey's dissertation committee, other faculty, and the President of Stanford University. *Id.* The mere number of letters alone was not decisive—equally important was that the recipients of the damaging letters "comprised a diverse group of people living in several states and totally unconnected either socially or professionally." *Id.*

In contrast to *Kinsey*, insufficient publicity was found in *Warfield v. Peninsula Golf & Country Club*, 214 Cal.App.3d 646, 262 Cal. Rptr. 890, 898 (1989). Warfield complained that the termination of her country club membership was illegal sex-based discrimination. An account in the club's newsletter allegedly placed her in a "false light." A demurrer to her false light claim was sustained on two alternative grounds: publication in the newsletter was not considered "a general public disclosure," and was considered privileged under the qualified privilege of Civil Code § 47(c). The number of members in the country club was not considered significant in determining whether the false light tort had been committed; their interest in the subject matter was determinative.

■ Here, the report was not distributed to the public. The report was only distributed to those individuals with a professional interest in the value of the Resort.[16] Order filed December 22, 1995, 4–7. The report was distributed by defendants to the Bank, which forwarded copies to certain individuals working for other participating lenders. One copy was left in a hotel room, but retrieved two hours later. Benchmark's decision to copy and distribute this report cannot be charged to defendants—plaintiffs cannot

---

**16.** Alternatively, this claim would be barred by Civil Code § 47(c). *Fellows v. National Enquirer, Inc.*, 42 Cal.3d 234, 228 Cal.Rptr. 215, 218–25, 721 P.2d 97, 99–107 (1986) (discussing reasons why restrictions on defamation actions should be applied to actions for false light); *Warfield*, 262 Cal.Rptr. at 898 (noting that false light claim would appear barred by Civil Code § 47(c)); *cf. Couch v. San Juan Unified School Dist.*, 33 Cal.App.4th 1491, 39 Cal.Rptr.2d 848 (1995) (claim for false light should be dismissed as superfluous where it incorporates all the factual allegations of libel claim and adds no further allegations).

complain of unwanted publicity for which they alone are responsible. *Cf. Live Oak Pub. Co. v. Cohagan,* 234 Cal.App.3d 1277, 286 Cal.Rptr. 198, 201–03 (1991) (holding that libel defendant is not liable for plaintiff's reasonable republication, where republication was not coerced). Since plaintiffs have no proof that the report was distributed to individuals beyond the small group professionally interested in the subject matter of the report, the false light claim must be dismissed.

### VII. The "Prima Facie" Tort

■ Section 870 of the Restatement Second of Torts provides:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

Plaintiffs seek to impose liability on defendants under this "prima facie" tort doctrine. This attempt fails, however, because the prima facie tort doctrine is not intended to supplant traditional tort elements or traditional tort defenses. Plaintiffs have shown, by the impressive array of torts they allege, that the conduct at issue here is adequately governed by existing torts, even if it is not actionable because of existing privileges. There is no need to create a new tort to cover the kind of conduct here alleged.

The comments to section 870 specifically explain that the section was never intended to be used to evade the elements or defenses required of traditional torts. *Willard v. Caterpillar, Inc.,* 40 Cal.App.4th 892, 48 Cal. Rptr.2d 607, 619–22 (1995).[17] California cases have, without explicitly acknowledging the policies behind the prima facie tort, re-fused to extend it into areas of established tort liability. *Francis v. Dun & Bradstreet,* 3 Cal.App.4th 535, 4 Cal.Rptr.2d 361, 365 (1994) (relabelling defamation claim as "prima facie tort" does not save claim from "truth is a complete defense"—"We cannot believe this defense can be abrogated merely because an artful pleader chooses to label the cause of action "prima facie tort" rather than defamation."); *Gould v. Maryland Sound Industries, Inc.,* 31 Cal.App.4th 1137, 37 Cal. Rptr.2d 718, 728 (1995) (plaintiff "cannot do an end-run around *Foley* [v. Interactive Data Corp., 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) ] by attempting to incorporate" claims for breach of implied covenant into an overall "prima facie tort."). Plaintiffs have experienced no trouble at all in identifying traditional torts which cover the defendants' conduct here. Their prima facie tort claim adds nothing to their case.

### VIII. Intentional Infliction of Emotional Distress

■ The tort of intentional infliction of emotional distress requires that plaintiff prove "extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress." *KOVR–TV, Inc. v. Superior Court,* 31 Cal.App.4th 1023, 37 Cal.Rptr.2d 431, 433 (1995). "Outrageous" conduct is conduct so extreme that it exceeds all bounds usually tolerated in a civilized society. *Id.* This element can be satisfied if the "recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, 'Outrageous!' " *Id.* No reasonable jury could find that defendants' alleged conduct—preparing a report that criticized the management of the resort—was so outrageous that it exceeds all bounds of

---

**17.** Comment (c) Balancing of interests

Tort law involves a balancing of the litigants in the light of the social and economic interests of society in general.... For the established intentional torts, this balancing process has already been worked out and developed in the form of a set of rules ... There is thus no need of using the balancing process afresh for each case in which an established tort exists; and the task is merely to apply the legal rules to the facts.

Comment (d) Relationship to established torts

Thus the established intentional torts and their established legal privileges amount to crystalizations of the general principle stated in this Section. In determining whether liability should be imposed in a particular case for an established intentional tort, neither court nor jury engages afresh in balancing the conflicting interests of the parties ...

1312

decent behavior.[18] Indeed, the existence of the qualified privilege shows that false, defamatory statements are tolerated when made without malice, and communicated only to those interested in the subject matter. Alternatively, the statements are privileged under Civil Code § 47(c). *See Deaile v. General Telephone Co.*, 40 Cal.App.3d 841, 115 Cal.Rptr. 582, 587 (1974) (applying qualified privilege to intentional infliction of emotional distress claim, where only conduct alleged to be outrageous was privileged communication). Cabanas cannot recover for intentional infliction of emotional distress.

### IX.   Conclusion

Plaintiffs' motion for reconsideration is DENIED. Defendants' motion for summary judgment is GRANTED. Judgment shall be entered accordingly.

IT IS SO ORDERED.

18. Plaintiffs also contend that the method by which defendants estimated the cost of terminating Benchmark's management contract was outrageous. *See* Opp. to Second Summary Judgment Mot., 14. It is not.